STRICKLER *v.* GREENE, WARDEN

No. 98–5864.   Argued March 3, 1999—Decided June 17, 1999

264

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, GINSBURG, and BREYER, JJ., joined in full, in which KENNEDY and SOUTER, JJ., joined as to Part III, and in which THOMAS, J., joined as to Parts I and IV. SOUTER, J., filed an opinion concurring in part and dissenting in part, in which KENNEDY, J., joined as to Part II, *post*, p. 296.

*Miguel A. Estrada* argued the cause for petitioner. With him on the briefs were *Barbara L. Hartung, Mark E. Olive,* and *John H. Blume.*

*Pamela A. Rumpz,* Assistant Attorney General of Virginia, argued the cause for respondent. With her on the brief was *Mark L. Earley,* Attorney General.*

JUSTICE STEVENS delivered the opinion of the Court.†

The District Court for the Eastern District of Virginia granted petitioner's application for a writ of habeas corpus and vacated his capital murder conviction and death sentence on the grounds that the Commonwealth had failed to disclose important exculpatory evidence and that petitioner had not, in consequence, received a fair trial. The Court of Appeals for the Fourth Circuit reversed because petitioner had not raised his constitutional claim at his trial or in state collateral proceedings. In addition, the Fourth Circuit concluded that petitioner's claim was, "in any event, without merit." App. 418, n. 8.[1] Finding the legal question presented by this

---

*Gerald T. Zerkin* filed a brief for the National Association of Criminal Defense Lawyers et al. as *amici curiae* urging reversal.

*Kent S. Scheidegger* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging affirmance.

†JUSTICE THOMAS joins Parts I and IV of this opinion. JUSTICE KENNEDY joins Part III.

[1] The opinion of the Court of Appeals is unreported. The judgment order is reported, *Strickler* v. *Pruett,* 149 F. 3d 1170 (CA4 1998). The opinion of the District Court is also unreported.

case considerably more difficult than the Fourth Circuit, we granted certiorari, 525 U. S. 809 (1998), to consider (1) whether the Commonwealth violated *Brady* v. *Maryland*, 373 U. S. 83 (1963), and its progeny; (2) whether there was an acceptable "cause" for petitioner's failure to raise this claim in state court; and (3), if so, whether he suffered prejudice sufficient to excuse his procedural default.

## I

In the early evening of January 5, 1990, Leanne Whitlock, an African-American sophomore at James Madison University, was abducted from a local shopping center and robbed and murdered. In separate trials, both petitioner and Ronald Henderson were convicted of all three offenses. Henderson was convicted of first-degree murder, a noncapital offense, whereas petitioner was convicted of capital murder and sentenced to death.[2]

At both trials, a woman named Anne Stoltzfus testified in vivid detail about Whitlock's abduction. The exculpatory material that petitioner claims should have been disclosed before trial includes documents prepared by Stoltzfus, and notes of interviews with her, that impeach significant portions of her testimony. We begin, however, by noting that, even without the Stoltzfus testimony, the evidence in the record was sufficient to establish petitioner's guilt on the murder charge. Whether petitioner would have been convicted of capital murder and received the death sentence if she had not testified, or if she had been sufficiently impeached, is less clear. To put the question in context, we review the trial testimony at some length.

### The Testimony at Trial

At about 4:30 p.m. on January 5, 1990, Whitlock borrowed a 1986 blue Mercury Lynx from her boyfriend, John Dean,

---

[2] Petitioner was tried in May 1990. Henderson fled the Commonwealth and was later apprehended in Oregon. He was tried in March 1991.

who worked in the Valley Shopping Mall in Harrisonburg, Virginia. At about 6:30 or 6:45 p.m., she left her apartment, intending to return the car to Dean at the mall. She did not return the car and was not again seen alive by any of her friends or family.

Petitioner's mother testified that she had driven petitioner and Henderson to Harrisonburg on January 5. She also testified that petitioner always carried a hunting knife that had belonged to his father. Two witnesses, a friend of Henderson's and a security guard, saw petitioner and Henderson at the mall that afternoon. The security guard was informed around 3:30 p.m. that two men, one of whom she identified at trial as petitioner, were attempting to steal a car in the parking lot. She had them under observation during the remainder of the afternoon but lost sight of them at about 6:45.

At approximately 7:30 p.m., a witness named Kurt Massie saw the blue Lynx at a location in Augusta County about 25 miles from Harrisonburg and a short distance from the cornfield where Whitlock's body was later found. Massie identified petitioner as the driver of the vehicle; he also saw a white woman in the front seat and another man in the back. Massie noticed that the car was muddy, and that it turned off Route 340 onto a dirt road.

At about 8 p.m., another witness saw the Lynx at Buddy's Market, with two men sitting in the front seat. The witness did not see anyone else in the car. At approximately 9 p.m., petitioner and Henderson arrived at Dice's Inn, a bar in Staunton, Virginia, where they stayed for about four or five hours. They danced with several women, including four prosecution witnesses: Donna Kay Tudor, Nancy Simmons, Debra Sievers, and Carolyn Brown. While there, Henderson gave Nancy Simmons a watch that had belonged to Whitlock. Petitioner spent most of his time with Tudor, who was later arrested for grand larceny based on her possession of the blue Lynx.

These four women all testified that Tudor had arrived at Dice's at about 8 p.m. Three of them noticed nothing unusual about petitioner's appearance, but Tudor saw some blood on his jeans and a cut on his knuckle. Tudor also testified that she, Henderson, and petitioner left Dice's together after it closed to search for marijuana. Henderson was driving the blue Lynx, and petitioner and Tudor rode in back. Tudor related that petitioner was leaning toward Henderson and talking with him; she overheard a crude conversation that could reasonably be interpreted as describing the assault and murder of a black person with a "rock crusher." Tudor stated that petitioner made a statement that implied that he had killed someone, so the person "wouldn't give him no more trouble." App. 99. Tudor testified that while she, petitioner, and Henderson were driving around, petitioner took out his knife and threatened to stab Henderson because he was driving recklessly. Petitioner then began driving.

At about 4:30 or 5 a.m. on January 6, petitioner drove Henderson to Kenneth Workman's apartment in Timberville.[3] Henderson went inside to get something, and petitioner and Tudor drove off without waiting for him. Workman testified that Henderson had blood on his pants and stated he had killed a black person.

Petitioner and Tudor then drove to a motel in Blue Ridge. A day or two later they went to Virginia Beach, where they spent the rest of the week. Petitioner gave Tudor pearl earrings that Whitlock had been wearing when she was last seen. Tudor saw Whitlock's driver's license and bank card in the glove compartment of the car. Tudor testified that petitioner unsuccessfully attempted to use Whitlock's bank card when they were in Virginia Beach.

When petitioner and Tudor returned to Augusta County, they abandoned the blue Lynx. On January 11, the police identified the car as Dean's, and found petitioner's and Tu-

---

[3] Workman was called as a defense witness.

dor's fingerprints on both the inside and the outside of the car. They also found shoe impressions that matched the soles of shoes belonging to petitioner. Inside the car, they retrieved a jacket that contained identification papers belonging to Henderson.

The police also recovered a bag at petitioner's mother's house that Tudor testified she and petitioner had left when they returned from Virginia Beach. The bag contained, among other items, three identification cards belonging to Whitlock and a black "tank top" shirt that was later found to have human blood and semen stains on it. Tr. 707.

On January 13, a farmer called the police to advise them that he had found Henderson's wallet; a search of the area led to the discovery of Whitlock's frozen, nude, and battered body. A 69-pound rock, spotted with blood, lay nearby. Forensic evidence indicated that Whitlock's death was caused by "multiple blunt force injuries to the head." App. 109. The location of the rock and the human blood on the rock suggested that it had been used to inflict these injuries. Based on the contents of Whitlock's stomach, the medical examiner determined that she died fewer than six hours after she had last eaten.[4]

A number of Caucasian hair samples were found at the scene, three of which were probably petitioner's. Given the weight of the rock, the prosecution argued that one of the killers must have held the victim down while the other struck her with the murder weapon.

Donna Tudor's estranged husband, Jay Tudor, was called by the defense and testified that in March she had told him that she was present at the murder scene and that petitioner did not participate in the murder. Jay Tudor's testimony was inconsistent in several respects with that of other witnesses. For example, he testified that several days elapsed

---

[4] Whitlock's roommate testified that Whitlock had dinner at 6 p.m. on January 5, 1990, just before she left for the mall to return Dean's car.

between the time that petitioner, Henderson, and Donna Tudor picked up Whitlock and the time of Whitlock's murder.

*Anne Stoltzfus' Testimony*

Anne Stoltzfus testified that on two occasions on January 5 she saw petitioner, Henderson, and a blonde girl inside the Harrisonburg mall, and that she later witnessed their abduction of Whitlock in the parking lot. She did not call the police, but a week and a half after the incident she discussed it with classmates at James Madison University, where both she and Whitlock were students. One of them called the police. The next night a detective visited her, and the following morning she went to the police station and told her story to Detective Claytor, a member of the Harrisonburg City Police Department. Detective Claytor showed her photographs of possible suspects, and she identified petitioner and Henderson "with absolute certainty" but stated that she had a slight reservation about her identification of the blonde woman. *Id.*, at 56.

At trial, Stoltzfus testified that, at about 6 p.m. on January 5, she and her 14-year-old daughter were in the Music Land store in the mall looking for a compact disc. While she was waiting for assistance from a clerk, petitioner, whom she described as "Mountain Man," and the blonde girl entered.[5]

---

[5] She testified to their appearances in great detail. She stated that petitioner had "a kind of multi layer look." He wore a grey T-shirt with a Harley Davidson insignia on it. The prosecutor showed Stoltzfus the shirt, stained with blood and semen, that the police had discovered at petitioner's mother's house. He asked if it were the same shirt she saw petitioner wearing at the mall. She replied, "That could have been it." App. 37, 39. Henderson "had either a white or light colored shirt, probably a short sleeve knit shirt and his pants were neat. They weren't just old blue jeans. They may have been new blue jeans or it may have just been more dressy slacks of some sort." *Id.*, at 37. The woman "had blonde hair, it was kind of in a shaggy cut down the back. She had blue eyes, she had a real sweet smile, kind of a small mouth. Just a touch of freckles on her face." *Id.*, at 60.

Because petitioner was "revved up" and "very impatient," she was frightened and backed up, bumping into Henderson (whom she called "Shy Guy"), and thought she felt something hard in the pocket of his coat. *Id.*, at 36–37.

Stoltzfus left the store, intending to return later. At about 6:45, while heading back toward Music Land, she again encountered the threesome: "Shy Guy" walking by himself, followed by the girl, and then "Mountain Man" yelling "Donna, Donna, Donna." The girl bumped into Stoltzfus and then asked for directions to the bus stop.[6] The three then left.

At first Stoltzfus tried to follow them because of her concern about petitioner's behavior, but she "lost him" and then headed back to Music Land. The clerk had not returned, so she and her daughter went to their car. While driving to another store, they saw a shiny dark blue car. The driver was "beautiful," "well dressed and she was happy, she was singing . . . ." *Id.*, at 41. When the blue car was stopped behind a minivan at a stop sign, Stoltzfus saw petitioner for the third time.

She testified:

> "'Mountain Man' came tearing out of the Mall entrance door and went up to the driver of the van and . . . was just really mad and ran back and banged on back of the backside of the van and then went back to the Mall entrance wall where 'Shy Guy' and 'Blonde Girl' was standing . . . . [T]hen we left [and before the van and a white pickup truck could turn] 'Mountain Man' came out again . . . ." *Id.*, at 42–43.

After first going to the passenger side of the pickup truck, petitioner came back to the black girl's car, "pounded on" the passenger window, shook the car, yanked the door open and jumped in. When he motioned for "Blonde Girl" and "Shy

---

[6] Stoltzfus stated that the girl caught a button in Stoltzfus' "open weave sweater, which is why I remember her attire." *Id.*, at 39.

Guy" to get in, the driver stepped on the gas and "just laid on the horn" but she could not go because there were people walking in front of the car. The horn "blew a long time" and petitioner

> "started hitting her . . . on the left shoulder, her right shoulder and then it looked like to me that he started hitting her on the head and I was, I just became concerned and upset. So I beeped, honked my horn and then she stopped honking the horn and he stopped hitting her and opened the door again and the 'Blonde Girl' got in the back and 'Shy Guy' followed and got behind him." *Id.*, at 44–45.

Stoltzfus pulled her car up parallel to the blue car, got out for a moment, got back in, and leaned over to ask repeatedly if the other driver was "O.K." The driver looked "frozen" and mouthed an inaudible response. Stoltzfus started to drive away and then realized "the only word that it could possibly be, was help." *Id.*, at 47. The blue car then drove slowly around her, went over the curb with its horn honking, and headed out of the mall. Stoltzfus briefly followed, told her daughter to write the license number on a "3x4 [inch] index card,"[7] and then left for home because she had an empty gas tank and "three kids at home waiting for supper." *Id.*, at 48–49.

At trial Stoltzfus identified Whitlock from a picture as the driver of the car and pointed to petitioner as "Mountain Man." When asked if pretrial publicity about the murder had influenced her identification, Stoltzfus replied "absolutely not." She explained:

> "[F]irst of all, I have an exceptionally good memory. I had very close contact with [petitioner] and he made an

---

[7] "I said to my fourteen[-year-]old daughter, write down the license number, you know, it was West Virginia, NKA 243 and I said help me to remember, 'No Kids Alone 243,' and I said remember, 243 is my age." *Id.*, at 48.

emotional impression with me because of his behavior and I, he caught my attention and I paid attention. So I have absolutely no doubt of my identification." *Id.*, at 58.

The Commonwealth did not produce any other witnesses to the abduction. Stoltzfus' daughter did not testify.

*The Stoltzfus Documents*

The materials that provide the basis of petitioner's *Brady* claim consist of notes taken by Detective Claytor during his interviews with Stoltzfus, and letters written by Stoltzfus to Claytor. They cast serious doubt on Stoltzfus' confident assertion of her "exceptionally good memory." Because the content of the documents is critical to petitioner's procedural and substantive claims, we summarize their content.

Exhibit 1[8] is a handwritten note prepared by Detective Claytor after his first interview with Stoltzfus on January 19, 1990, just two weeks after the crime. The note indicates that she could not identify the black female victim. The only person Stoltzfus apparently could identify at this time was the white female. *Id.*, at 306.

Exhibit 2 is a document prepared by Detective Claytor some time after February 1. It contains a summary of his interviews with Stoltzfus conducted on January 19 and January 20, 1990.[9] At that time "she was not sure whether she could identify the white males but felt sure she could identify the white female."

---

[8] These materials were originally attached to an affidavit submitted with petitioner's motion for summary judgment on his federal petition for habeas corpus. Because both the District Court and the Court of Appeals referred to the documents by their exhibit numbers, we have done the same.

[9] As the District Court pointed out, however, it omits reference to the fact that Stoltzfus originally said that she could not identify the victim—a fact recorded in his handwritten notes. *Id.*, at 387.

Exhibit 3 is entitled "Observations" and includes a summary of the abduction.

Exhibit 4 is a letter written by Stoltzfus to Claytor three days after their first interview "to clarify some of my confusion for you." The letter states that she had not remembered being at the mall, but that her daughter had helped jog her memory. Her description of the abduction includes the comment: "I have a very vague memory that I'm not sure of. It seems as if the wild guy that I saw had come running through the door and up to a bus as the bus was pulling off. . . . Then the guy I saw came running up to the black girl's window. Were those 2 memories the same person?" *Id.*, at 316. In a postscript she noted that her daughter "doesn't remember seeing the 3 people get into the black girl's car . . . ." *Ibid.*

Exhibit 5 is a note to Claytor captioned "My Impressions of 'The Car,'" which contains three paragraphs describing the size of the car and comparing it with Stoltzfus' Volkswagen Rabbit, but not mentioning the license plate number that she vividly recalled at the trial. *Id.*, at 317–318.

Exhibit 6 is a brief note from Stoltzfus to Claytor dated January 25, 1990, stating that after spending several hours with John Dean, Whitlock's boyfriend, "looking at current photos," she had identified Whitlock "beyond a shadow of a doubt."[10] *Id.*, at 318. The District Court noted that by the time of trial her identification had been expanded to include a description of her clothing and her appearance as a college kid who was "singing" and "happy." *Id.*, at 387–388.

Exhibit 7 is a letter from Stoltzfus to Detective Claytor, dated January 16, 1990, in which she thanks him for his "patience with my sometimes muddled memories." She states that if the student at school had not called the police, "I never would have made any of the associations that you helped me make." *Id.*, at 321.

---

[10] Stoltzfus' trial testimony made no mention of her meeting with Dean.

In Exhibit 8, which is undated and summarizes the events described in her trial testimony, Stoltzfus commented:

"So where is the 3x4 card? . . . It would have been very nice if I could have remembered all this at the time and had simply gone to the police with the information. But I totally wrote this off as a trivial episode of college kids carrying on and proceeded with my own full-time college load at JMU. . . . Monday, January 15th. I was cleaning out my car and found the 3x4 card. I tore it into little pieces and put it in the bottom of a trash bag." *Id.*, at 326.

There is a dispute between the parties over whether petitioner's counsel saw Exhibits 2, 7, and 8 before trial. The prosecuting attorney conceded that he himself never saw Exhibits 1, 3, 4, 5, and 6 until long after petitioner's trial, and they were not in the file he made available to petitioner.[11] For purposes of this case, therefore, we assume that petitioner proceeded to trial without having seen Exhibits 1, 3, 4, 5, and 6.[12]

---

[11] The prosecutor recalled that Exhibits 2, 7, and 8 had been in his open file, *id.*, at 365–368, but the lawyer who represented Henderson at his trial swore that they were not in the file, *id.*, at 330; the recollection of petitioner's trial counsel was somewhat equivocal. Lead defense counsel was sure he had not seen the documents, *id.*, at 300, while petitioner's other lawyer signed an affidavit to the effect that he does "remember the information contained in [the documents]" but "cannot recall if I have seen these specific documents," *id.*, at 371.

[12] Although the parties have not advanced an explanation for the nondisclosure of the documents, perhaps it was an inadvertent consequence of the fact that Harrisonburg is in Rockingham County and the trial was conducted by the Augusta County prosecutor. We note, however, that the prosecutor is responsible for "any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles* v. *Whitley*, 514 U. S. 419, 437 (1995). Thus, the Commonwealth, through its prosecutor, is charged with knowledge of the Stoltzfus materials for purposes of *Brady* v. *Maryland*, 373 U. S. 83 (1963).

## State Proceedings

Petitioner was tried in Augusta County, where Whitlock's body was found, on charges of capital murder, robbery, and abduction. Because the prosecutor maintained an open file policy, which gave petitioner's counsel access to all of the evidence in the Augusta County prosecutor's files,[13] petitioner's counsel did not file a pretrial motion for discovery of possible exculpatory evidence.[14] In closing argument, petitioner's lawyer effectively conceded that the evidence was sufficient to support the robbery and abduction charges, as well as the lesser offense of first-degree murder, but argued that the evidence was insufficient to prove that petitioner was guilty of capital murder. *Id.*, at 192–193.

The judge instructed the jury that petitioner could be found guilty of the capital charge if the evidence established beyond a reasonable doubt that he "jointly participated in the fatal beating" and "was an active and immediate partici-

---

[13] In the federal habeas proceedings, the prosecutor gave the following sworn answer to an interrogatory requesting him to state what materials were disclosed by him to defense counsel pursuant to *Brady:* "I disclosed my entire prosecution file to Strickler's defense counsel prior to Strickler's trial by allowing him to inspect my entire prosecution file including, but not limited to, all police reports in the file and all witness statements in the file." App. 368. Petitioner's trial counsel had shared the prosecutor's understanding of the "open file" policy. In an affidavit filed in the state habeas proceeding, they stated that they "thoroughly investigated" petitioner's case. "In this we were aided by the prosecutor's office, which gave us full access to their files and the evidence they intended to present. We made numerous visits to their office to examine these files .... As a result of this cooperation, they introduced nothing at trial of which we were previously unaware." *Id.*, at 223.

[14] In its pleadings on state habeas, the Commonwealth explained: "From the inception of this case, the prosecutor's files were open to the petitioner's counsel. Each of the petitioner's attorneys made numerous visits to the prosecutor's offices and reviewed *all* the evidence the Commonwealth intended to present. ... Given that counsel were voluntarily given full disclosure of everything known to the government, there was no need for a formal *[Brady]* motion." *Id.*, at 212–213.

pant in the act or acts that caused the victim's death." *Id.*, at 160–161. The jury found petitioner guilty of abduction, robbery, and capital murder. *Id.*, at 200–201. After listening to testimony and arguments presented during the sentencing phase, the jury made findings of "vileness" and "future dangerousness," and unanimously recommended the death sentence that the judge later imposed.

The Virginia Supreme Court affirmed the conviction and sentence. *Strickler* v. *Commonwealth*, 241 Va. 482, 404 S. E. 2d 227 (1991). It held that the trial court had properly instructed the jury on the "joint perpetrator" theory of capital murder and that the evidence, viewed most favorably in support of the verdict, amply supported the prosecution's theory that both petitioner and Henderson were active participants in the actual killing.[15]

In December 1991, the Augusta County Circuit Court appointed new counsel to represent petitioner in state habeas corpus proceedings. State habeas counsel advanced an

---

[15] "The Commonwealth's theory of the case was that Strickler and Henderson had acted jointly to accomplish the actual killing. It contended at trial, and argues on appeal, that the physical evidence points to a violent struggle between the assailants and the victim, in which Strickler's hair had actually been torn out by the roots. Although Leanne had been beaten and kicked, none of her injuries would have been sufficient to immobilize her until her skull was crushed with the 69-pound rock. Because, the Commonwealth's argument goes, the rock had been dropped on her head at least twice, while she was on the ground, leaving two bloodstained depressions in the frozen earth, it would have been necessary that she be held down by one assailant while the other lifted the rock and dropped it on her head.

"The weight and dimensions of the 69-pound bloodstained rock, which was introduced in evidence as an exhibit, made it apparent that a single person could not have lifted it and dropped or thrown it while simultaneously holding the victim down. The bloodstains on Henderson's jacket as well as on Strickler's clothing further tended to corroborate the Commonwealth's theory that the two men had been in the immediate presence of the victim's body when the fatal blows were struck and, hence, had jointly participated in the killing." *Strickler*, 241 Va., at 494, 404 S. E. 2d, at 235.

ineffective-assistance-of-counsel claim based, in part, on trial counsel's failure to file a motion under *Brady* v. *Maryland*, 373 U. S. 83 (1963), "to have the Commonwealth disclose to the defense all exculpatory evidence known to it—or in its possession." App. 205–206. In answer to that claim, the Commonwealth asserted that such a motion was unnecessary because the prosecutor had maintained an open file policy.[16] The Circuit Court dismissed the petition, and the State Supreme Court affirmed. *Strickler* v. *Murray*, 249 Va. 120, 452 S. E. 2d 648 (1995).

### Federal Habeas Corpus Proceedings

In March 1996, petitioner filed a federal habeas corpus petition in the Eastern District of Virginia. The District Court entered a sealed, *ex parte* order granting petitioner's counsel the right to examine and to copy all of the police and prosecution files in the case. Record, Doc. No. 20. That order led to petitioner's counsel's first examination of the Stoltzfus materials, described *supra*, at 273–275.

Based on the discovery of those exhibits, petitioner for the first time raised a direct claim that his conviction was invalid because the prosecution had failed to comply with the rule of *Brady* v. *Maryland*. The District Court granted the Commonwealth's motion to dismiss all claims except for petitioner's contention that the Commonwealth violated *Brady*, that he received ineffective assistance of counsel,[17] and that he was denied due process of law under the Fifth and Fourteenth Amendments. In its order denying the Commonwealth's motion to dismiss, the District Court found that petitioner had "demonstrated cause for his failure to raise this claim earlier [because] [d]efense counsel had no independent access to this material and the Commonwealth repeatedly withheld it throughout Petitioner's state habeas proceeding." App. 287.

---

[16] See n. 14, *supra*.

[17] Petitioner later voluntarily dismissed this claim. App. 384.

After reviewing the Stoltzfus materials, and making the assumption that the three disputed exhibits had been available to the defense, the District Court concluded that the failure to disclose the other five was sufficiently prejudicial to undermine confidence in the jury's verdict. *Id.*, at 396. It granted summary judgment to petitioner and granted the writ.

The Court of Appeals vacated in part and remanded. It held that petitioner's *Brady* claim was procedurally defaulted because the factual basis for the claim was available to him at the time he filed his state habeas petition. Given that he knew that Stoltzfus had been interviewed by Harrisonburg police officers, the court opined that "reasonably competent counsel would have sought discovery in state court" of the police files, and that in response to this "simple request, it is likely the state court would have ordered the production of the files." App. 421. Therefore, the Court of Appeals reasoned, it could not address the *Brady* claim unless petitioner could demonstrate both cause and actual prejudice.

Under Fourth Circuit precedent a party "cannot establish cause to excuse his default if he should have known of such claims through the exercise of reasonable diligence." App. 423 (citing *Stockton* v. *Murray*, 41 F. 3d 920, 925 (1994)). Having already decided that the claim was available to reasonably competent counsel, the Fourth Circuit stated that the basis for finding procedural default also foreclosed a finding of cause. Moreover, the Court of Appeals reasoned, petitioner could not fault his trial lawyers' failure to make a *Brady* claim because they reasonably relied on the prosecutor's open file policy. App. 423–424.[18]

As an alternative basis for decision, the Court of Appeals also held that petitioner could not establish prejudice be-

---

[18] For reasons we do not entirely understand, the Court of Appeals thus concluded that, while it was reasonable for trial counsel to rely on the open file policy, it was unreasonable for postconviction counsel to do so.

cause "the Stoltzfus materials would have provided little or no help . . . in either the guilt or sentencing phases of the trial." *Id.*, at 425. With respect to guilt, the court noted that Stoltzfus' testimony was not relevant to petitioner's argument that he was only guilty of first-degree murder rather than capital murder because Henderson, rather than he, actually killed Whitlock. With respect to sentencing, the court concluded that her testimony "was of no import" because the findings of future dangerousness and vileness rested on other evidence. Finally, the court noted that even if it could get beyond the procedural default, the *Brady* claim would fail on the merits because of the absence of prejudice. App. 425, n. 11. The Court of Appeals, therefore, reversed the District Court's judgment and remanded the case with instructions to dismiss the petition.

## II

The first question that our order granting certiorari directed the parties to address is whether the Commonwealth violated the *Brady* rule. We begin our analysis by identifying the essential components of a *Brady* violation.

In *Brady*, this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U. S., at 87. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States* v. *Agurs*, 427 U. S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States* v. *Bagley*, 473 U. S. 667, 676 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*, at 682; see also *Kyles* v. *Whitley*, 514 U. S. 419, 433–434 (1995). Moreover, the rule encompasses evidence "known only to po-

lice investigators and not to the prosecutor." *Id.*, at 438. In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U. S., at 437.

These cases, together with earlier cases condemning the knowing use of perjured testimony,[19] illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger* v. *United States*, 295 U. S. 78, 88 (1935).

This special status explains both the basis for the prosecution's broad duty of disclosure and our conclusion that not every violation of that duty necessarily establishes that the outcome was unjust. Thus the term *"Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence[20]—that is, to any suppression of so-called *"Brady* material"—although, strictly speaking, there is never a real *"Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the ac-

---

[19] See, *e. g., Mooney* v. *Holohan*, 294 U. S. 103, 112 (1935) *(per curiam); Pyle* v. *Kansas*, 317 U. S. 213, 216 (1942); *Napue* v. *Illinois*, 360 U. S. 264, 269–270 (1959).

[20] Consider, for example, this comment in the dissenting opinion in *Kyles* v. *Whitley:* "It is petitioner's burden to show that in light of all the evidence, including that untainted by the *Brady* violation, it is reasonably probable that a jury would have entertained a reasonable doubt regarding petitioner's guilt." 514 U. S., at 460 (opinion of SCALIA, J.).

cused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

Two of those components are unquestionably established by the record in this case. The contrast between (a) the terrifying incident that Stoltzfus confidently described in her testimony and (b) her initial perception of that event "as a trivial episode of college kids carrying on" that her daughter did not even notice, suffices to establish the impeaching character of the undisclosed documents.[21] Moreover, with respect to at least five of those documents, there is no dispute about the fact that they were known to the Commonwealth but not disclosed to trial counsel. It is the third component—whether petitioner has established the prejudice necessary to satisfy the "materiality" inquiry—that is the most difficult element of the claimed *Brady* violation in this case.

Because petitioner acknowledges that his *Brady* claim is procedurally defaulted, we must first decide whether that default is excused by an adequate showing of cause and prejudice. In this case, cause and prejudice parallel two of the three components of the alleged *Brady* violation itself. The suppression of the Stoltzfus documents constitutes one of the causes for the failure to assert a *Brady* claim in the state courts, and unless those documents were "material" for *Brady* purposes, their suppression did not give rise to sufficient prejudice to overcome the procedural default.

## III

Respondent expressly disavows any reliance on the fact that petitioner's *Brady* claim was not raised at trial. Brief

---

[21] We reject respondent's contention that these documents do not fall under *Brady* because they were "inculpatory." Brief for Respondent 41. Our cases make clear that *Brady*'s disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness. *United States* v. *Bagley*, 473 U. S. 667, 676 (1985).

for Respondent 17–18, n. 6. He states that the Commonwealth has consistently argued "that the claim is defaulted because it could have been raised on state habeas corpus through the exercise of due diligence, but was not." *Ibid.* Despite this concession, it is appropriate to begin the analysis of the "cause" issue by explaining why petitioner's reasons for failing to raise his *Brady* claim at trial are acceptable under this Court's cases.

Three factors explain why trial counsel did not advance this claim: The documents were suppressed by the Commonwealth; the prosecutor maintained an open file policy;[22] and trial counsel were not aware of the factual basis for the claim. The first and second factors—*i. e.*, the nondisclosure and the open file policy—are both fairly characterized as conduct attributable to the Commonwealth that impeded trial counsel's access to the factual basis for making a *Brady* claim.[23] As we explained in *Murray* v. *Carrier*, 477 U. S. 478, 488 (1986), it is just such factors that ordinarily establish the existence of cause for a procedural default.[24]

---

[22] While the precise dimensions of an "open file policy" may vary from jurisdiction to jurisdiction, in this case it is clear that the prosecutor's use of the term meant that his entire prosecution file was made available to the defense. App. 368; see also n. 13, *supra.*

[23] We certainly do not criticize the prosecution's use of the open file policy. We recognize that this practice may increase the efficiency and the fairness of the criminal process. We merely note that, if a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady.*

[24] "[W]e think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel, see *Reed* v. *Ross*, 468 U. S., at 16, or that 'some interference by officials,' *Brown* v. *Allen*, 344 U. S. 443, 486 (1953), made compliance impracticable, would constitute cause under this stand-

If it was reasonable for trial counsel to rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials would be included in the open files tendered to defense counsel for their examination, we think such reliance by counsel appointed to represent petitioner in state habeas proceedings was equally reasonable. Indeed, in *Murray* we expressly noted that "the standard for cause should not vary depending on the timing of a procedural default." *Id.*, at 491.

Respondent contends, however, that the prosecution's maintenance of an open file policy that did not include all it was purported to contain is irrelevant because the factual basis for the assertion of a *Brady* claim was available to state habeas counsel. He presses two factors to support this assertion. First, he argues that an examination of Stoltzfus' trial testimony,[25] as well as a letter published in a local newspaper,[26] made it clear that she had had several interviews with Detective Claytor. Second, the fact that the Federal District Court entered an order allowing discovery of the Harrisonburg police files indicates that diligent counsel could

---

ard." *Murray*, 477 U. S., at 488; see also *Amadeo* v. *Zant*, 486 U. S. 214, 221–222 (1988).

[25] Stoltzfus testified to meeting with Claytor at least three times. App. 55–56.

[26] In her letter, which appeared on July 18, 1990 (after petitioner's trial) in the Harrisonburg Daily News-Record, Stoltzfus stated: "It never occurred to me that I was witnessing an abduction. In fact, if it hadn't been for the intelligent, persistent, professional work of Detective Daniel Claytor, I still wouldn't realize it. What sounded like a coherent story at the trial was the result of an incredible effort by the police to fit a zillion little puzzle pieces into one big picture." *Id.*, at 250. Stoltzfus also gave a pretrial interview to a reporter with the Roanoke Times that conflicted in some respects with her trial testimony, principally because she identified the blonde woman at the mall as Tudor. *Id.*, at 373.

have obtained a similar order from the state court. We find neither factor persuasive.

Although it is true that petitioner's lawyers—both at trial and in post-trial proceedings—must have known that Stoltzfus had had multiple interviews with the police, it by no means follows that they would have known that records pertaining to those interviews, or that the notes that Stoltzfus sent to the detective, existed and had been suppressed.[27] Indeed, if respondent is correct that Exhibits 2, 7, and 8 were in the prosecutor's "open file," it is especially unlikely that counsel would have suspected that additional impeaching evidence was being withheld. The prosecutor must have known about the newspaper articles and Stoltzfus' meetings with Claytor, yet he did not believe that his prosecution file was incomplete.

Furthermore, the fact that the District Court entered a broad discovery order even before federal habeas counsel had advanced a *Brady* claim does not demonstrate that a state court also would have done so.[28] Indeed, as we understand Virginia law and respondent's position, petitioner would not have been entitled to such discovery in state ha-

---

[27] The defense could not discover copies of these notes from Stoltzfus herself, because she refused to speak with defense counsel before trial. *Id.*, at 370.

[28] The parties have been unable to provide, and the record does not illuminate, the factual basis on which the District Court entered the discovery order. It was granted *ex parte* and under seal and furnished broad access to any records relating to petitioner. District Court Record, Doc. No. 20. The Fourth Circuit has since found that federal district courts do not possess the authority to issue *ex parte* discovery orders in habeas proceedings. *In re Pruett*, 133 F. 3d 275, 280 (1997). We express no opinion on the Fourth Circuit's decision on this question. However, we note that it is unlikely that petitioner would have been granted in state court the sweeping discovery that led to the Stoltzfus materials, since Virginia law limits discovery available during state habeas. Indeed, it is not even clear that he had a right to such discovery in federal court. See n. 29, *infra.*

beas proceedings without a showing of good cause.[29] Even pursuant to the broader discovery provisions afforded at trial, petitioner would not have had access to these materials under Virginia law, except as modified by *Brady*.[30] Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review. Nor, in our opinion, should such suspicion suffice to impose a duty on counsel to advance a claim for which they have no evidentiary support. Proper respect for state procedures counsels against a requirement that all possible claims be raised in state collateral proceedings, even when no known facts support them. The presumption, well established by " 'tradition and experience,' " that prosecutors have fully " 'discharged their official duties,' " *United States* v. *Mezzanatto*, 513 U. S. 196, 210 (1995), is inconsistent with the novel suggestion that conscientious defense counsel have a procedural obligation to assert consti-

---

[29] Virginia law provides that "no discovery shall be allowed in any proceeding for a writ of habeas corpus or in the nature of coram nobis without prior leave of the court, which may deny or limit discovery in any such proceeding." Va. Sup. Ct. Rule 4:1(b)(5)(3)(b) (1998); see also *Yeatts* v. *Murray*, 249 Va. 285, 289, 455 S. E. 2d 18, 21 (1995). Respondent acknowledges that petitioner was not entitled to discovery under Virginia law. Brief for Respondent 25.

[30] See Va. Sup. Ct. Rule 3A:11 (1998). This rule expressly excludes from defendants "the discovery or inspection of statements made by Commonwealth witnesses or prospective Commonwealth witnesses to agents of the Commonwealth or of reports, memoranda or other internal Commonwealth documents made by agents in connection with the investigation or prosecution of the case, except [for scientific reports of the accused or alleged victim]." The Virginia Supreme Court found that petitioner had been afforded all the discovery he was entitled to on direct review. "Limited discovery is permitted in criminal cases by the Rules of Court. . . . Strickler had the benefit of all the discovery to which he was entitled under the Rules. Those rights do not extend to general production of evidence, except in the limited areas prescribed by Rule 3A:11." *Strickler* v. *Commonwealth*, 241 Va. 482, 491, 404 S. E. 2d 227, 233 (1991).

tutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred.

Respondent's position on the "cause" issue is particularly weak in this case because the state habeas proceedings confirmed petitioner's justification for his failure to raise a *Brady* claim. As already noted, when he alleged that trial counsel had been incompetent because they had not advanced such a claim, the warden responded by pointing out that there was no need for counsel to do so because they "were voluntarily given full disclosure of everything known to the government."[31] Given that representation, petitioner had no basis for believing the Commonwealth had failed to comply with *Brady* at trial.[32]

Respondent also argues that our decisions in *Gray* v. *Netherland,* 518 U. S. 152 (1996), and *McCleskey* v. *Zant,* 499 U. S. 467 (1991), preclude the conclusion that the cause for petitioner's default was adequate. In both of those cases, however, the petitioner was previously aware of the factual basis for his claim but failed to raise it earlier. See *Gray,* 518 U. S., at 161; *McCleskey,* 499 U. S., at 498–499. In the context of a *Brady* claim, a defendant cannot conduct the "rea-

---

[31] This statement is quoted in full at n. 14, *supra.* Respondent argues that this representation is not dispositive because it was made in his motion to dismiss and therefore cannot excuse the failure to include a *Brady* claim in the petitioner's original state habeas pleading. We find the timing of the statement irrelevant, since the warden's response merely summarizes the Commonwealth's "open file" policy, instituted by the prosecution at the inception of the case.

[32] Furthermore, in its opposition to petitioner's motion during state habeas review for funds for an investigator, the Commonwealth argued: "Strickler's Petition contains 139 separate habeas claims. By requesting appointment of an investigator 'to procure the necessary factual basis to support certain of Petitioner's claims' (Motion, p. 1), Petitioner is implicitly conceding that he is not aware of factual support for the claims he has already made. Respondent agrees." App. 242.

In light of these assertions, we fail to see how the Commonwealth believes petitioner could have shown "good cause" sufficient to get discovery on a *Brady* claim in state habeas.

sonable and diligent investigation" mandated by *McCleskey* to preclude a finding of procedural default when the evidence is in the hands of the State.[33]

The controlling precedents on "cause" are *Murray* v. *Carrier*, 477 U. S., at 488, and *Amadeo* v. *Zant*, 486 U. S. 214 (1988). As we explained in the latter case:

> "If the District Attorney's memorandum was not reasonably discoverable because it was concealed by Putnam County officials, and if that concealment, rather than tactical considerations, was the reason for the failure of petitioner's lawyers to raise the jury challenge in the trial court, then petitioner established ample cause to excuse his procedural default under this Court's precedents." *Id.*, at 222.[34]

There is no suggestion that tactical considerations played any role in petitioner's failure to raise his *Brady* claim in state court. Moreover, under *Brady* an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment. "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Agurs*, 427 U. S., at 110.

---

[33] We do not reach, because it is not raised in this case, the impact of a showing by the State that the defendant was aware of the existence of the documents in question and knew, or could reasonably discover, how to obtain them. Although *Gray* involved a procedurally defaulted *Brady* claim, in that case, the Court found that the petitioner had made "no attempt to demonstrate cause or prejudice for his default." *Gray*, 518 U. S., at 162.

[34] It is noteworthy that both of the reasons on which we relied in *McCleskey* to distinguish *Amadeo* also apply to this case: "This case differs from *Amadeo* in two crucial respects. First, there is no finding that the State concealed evidence. And second, even if the State intentionally concealed the 21-page document, the concealment would not establish cause here because, in light of McCleskey's knowledge of the information in the document, any initial concealment would not have prevented him from raising the claim in the first federal petition." 499 U. S., at 501–502.

In summary, petitioner has established cause for failing to raise a *Brady* claim prior to federal habeas because (a) the prosecution withheld exculpatory evidence; (b) petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence; and (c) the Commonwealth confirmed petitioner's reliance on the open file policy by asserting during state habeas proceedings that petitioner had already received "everything known to the government."[35]  We need not decide in this case whether any one or two of these factors would be sufficient to constitute cause, since the combination of all three surely suffices.

## IV

The differing judgments of the District Court and the Court of Appeals attest to the difficulty of resolving the issue of prejudice.   Unlike the Fourth Circuit, we do not believe that "the Stolzfus [*sic*] materials would have provided little or no help to Strickler in either the guilt or sentencing phases of the trial."   App. 425.   Without a doubt, Stoltzfus' testimony was prejudicial in the sense that it made petitioner's conviction more likely than if she had not testified, and discrediting her testimony might have changed the outcome of the trial.

That, however, is not the standard that petitioner must satisfy in order to obtain relief.   He must convince us that "there is a reasonable probability" that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.   As we stressed in *Kyles:* "[T]he adjective is important.   The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its ab-

---

[35] Because our opinion does not modify *Brady,* we reject respondent's contention that we announce a "new rule" today.   See *Bousley* v. *United States,* 523 U. S. 614 (1998).

sence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 514 U. S., at 434.

The Court of Appeals' negative answer to that question rested on its conclusion that, without considering Stoltzfus' testimony, the record contained ample, independent evidence of guilt, as well as evidence sufficient to support the findings of vileness and future dangerousness that warranted the imposition of the death penalty. The standard used by that court was incorrect. As we made clear in *Kyles*, the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. *Id.*, at 434–435. Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*, at 435.

The District Judge decided not to hold an evidentiary hearing to determine whether Exhibits 2, 7, and 8 had been disclosed to the defense, because he was satisfied that the "potentially devastating impeachment material" contained in the other five warranted the entry of summary judgment in petitioner's favor. App. 392. The District Court's conclusion that the admittedly undisclosed documents were sufficiently important to establish a violation of the *Brady* rule was supported by the prosecutor's closing argument. That argument relied on Stoltzfus' testimony to demonstrate petitioner's violent propensities and to establish that he was the instigator and leader in Whitlock's abduction and, by inference, her murder. The prosecutor emphasized the importance of Stoltzfus' testimony in proving the abduction:

> "[W]e are lucky enough to have an eyewitness who saw [what] happened out there in that parking lot. [In a] lot of cases you don't. A lot of cases you can just theorize what happened in the actual abduction. But Mrs. Stoltzfus was there, she saw [what] happened." App. 169.

Given the record evidence involving Henderson,[36] the District Court concluded that, without Stoltzfus' testimony, the jury might have been persuaded that Henderson, rather than petitioner, was the ringleader. He reasoned that a "reasonable probability of conviction" of first-degree, rather than capital, murder sufficed to establish the materiality of the undisclosed Stoltzfus materials and, thus, a *Brady* violation. App. 396.

The District Court was surely correct that there is a reasonable *possibility* that either a total, or just a substantial, discount of Stoltzfus' testimony might have produced a different result, either at the guilt or sentencing phases. Petitioner did, for example, introduce substantial mitigating evidence.about abuse he had suffered as a child at the hands of his stepfather.[37] As the District Court recognized, however, petitioner's burden is to establish a reasonable *probability* of a different result. *Kyles*, 514 U. S., at 434.

---

[36] The District Court summarized the evidence against Henderson. "Henderson's clothes had blood on them that night. Henderson had property belonging to Whitlock and gave her watch to a woman, Simmons, while at a restaurant known as Dice's Inn. Tr. 541. Henderson left Dice's Inn driving Whitlock's car. Henderson's wallet was found in the vicinity of Whitlock's body and was possibly lost during his struggle with her. Significantly, Henderson confessed to a friend on the night of the murder that he had just killed an unidentified black person and that friend observed blood on Henderson's jeans." App. 395.

[37] At sentencing, the trial court discussed the mitigation evidence: "On the charge of capital murder . . . it is difficult . . . to sit here and listen to the testimony of [petitioner's mother] and Mr. Strickler's two sisters and not feel a great, great deal of sympathy for, for any person who has a childhood and a life like Mr. Strickler has had. He was in no way responsible for the circumstances of his birth. He was brutalized from the minute he's, almost from the minute he was born and certainly with his . . . limitations and his ability with which he was born, it would have been extremely difficult for him to, to help himself. And difficult, when you look at a case like that to feel but anything but sympathy for him." Sentencing Hearing, 20 Record 57–58.

Even if Stoltzfus and her testimony had been entirely discredited, the jury might still have concluded that petitioner was the leader of the criminal enterprise because he was the one seen driving the car by Kurt Massie near the location of the murder and the one who kept the car for the following week.[38]  In addition, Tudor testified that petitioner threatened Henderson with a knife later in the evening.

More importantly, however, petitioner's guilt of capital murder did not depend on proof that he was the dominant partner: Proof that he was an equal participant with Henderson was sufficient under the judge's instructions.[39]  Accordingly, the strong evidence that Henderson was a killer is entirely consistent with the conclusion that petitioner was also an actual participant in the killing.[40]

---

[38] As the trial court stated at petitioner's sentencing hearing: "The facts in this case which support this jury verdict are one that Mr. Strickler was . . . in control of this situation.  He was in control at the shopping center in Harrisonburg.  He was in control when the car went into the field up here on the 340 north of Waynesboro.  He was in control thereafter, he ended up with the car.  There is no question who . . . was in control of this entire situation."  *Id.*, at 22.

[39] The judge gave the following instruction at petitioner's trial: "You may find the defendant guilty of capital murder if the evidence establishes that the defendant jointly participated in the fatal beating, if it is established beyond a reasonable doubt that the defendant was an active and immediate participant in the act or acts that caused the victim's death."  *Strickler* v. *Commonwealth*, 241 Va., at 493–494, 404 S. E. 2d, at 234–235. The Virginia Supreme Court affirmed the propriety of this instruction on petitioner's direct appeal.  *Id.*, at 495, 404 S. E. 2d, at 235.

[40] It is also consistent with the fact that Henderson was convicted of first-degree murder but acquitted of capital murder after his jury, unlike petitioner's, was instructed that they could convict him of capital murder only if they found that he had " 'inflict[ed] the fatal blows.' "  Henderson's jury was instructed, " 'One who is present aiding and abetting the actual killing, but who does not inflict the fatal blows that cause death is a principle [sic] in the second degree, and may not be found guilty of capital murder.  Before you can find the defendant guilty of capital murder, the evidence must establish beyond a reasonable doubt that the defendant was

Furthermore, there was considerable forensic and other physical evidence linking petitioner to the crime.[41] The weight and size of the rock,[42] and the character of the fatal injuries to the victim,[43] are powerful evidence supporting the conclusion that two people acted jointly to commit a brutal murder.

We recognize the importance of eyewitness testimony; Stoltzfus provided the only disinterested, narrative account of what transpired on January 5, 1990. However, Stoltzfus' vivid description of the events at the mall was not the only evidence that the jury had before it. Two other eyewit-

---

an active and immediate participant in the acts that caused the death.'" 2 App. in No. 97–29 (CA4), p. 777.

Henderson's trial took place before the Virginia Supreme Court affirmed the trial instruction, and the "joint perpetrator" theory it embodied, given at petitioner's trial. *Strickler* v. *Commonwealth,* 241 Va., at 494, 404 S. E. 2d, at 235. Petitioner's trial judge rejected one of petitioner's proffered instructions, which would have required the Commonwealth to prove that "the defendant was the person who actually delivered the blow that killed Leanne Whitlock." *Ibid.* Petitioner's trial judge recused himself from presiding over Henderson's trial, indicating that he had already formed his own opinion about what had happened the night of Whitlock's murder. 21 Record 2.

[41] For example, the police recovered hairs on a bra and shirt found with Whitlock's body that "were microscopically alike in all identifiable characteristics" to petitioner's hair. App. 135. The shirt recovered from the car at Strickler's mother's house had human blood on it. Petitioner's fingerprints were found on the outside and inside of the car taken from Whitlock. *Id.,* at 128–129. Tudor testified that petitioner's pants had blood on them, and he had a cut on his knuckle. *Id.,* at 95.

[42] The trial judge thought the shape of the rock so significant to the jury's conclusion that he instructed the lawyers to have "detailed, high quality photographs taken of [the rock] . . . and I want it put in the record of the case." Sentencing Hearing, 20 Record 53.

[43] The Deputy Chief Medical Examiner, who performed the autopsy, testified that the object that produced the fractures in Whitlock's skull caused "severe lacerations to the brain," and any two of the four fractures would have been fatal. App. 112.

nesses, the security guard and Henderson's friend, placed petitioner and Henderson at the Harrisonburg Valley Shopping Mall on the afternoon of Whitlock's murder. One eyewitness later saw petitioner driving Dean's car near the scene of the murder.

The record provides strong support for the conclusion that petitioner would have been convicted of capital murder and sentenced to death, even if Stoltzfus had been severely impeached. The jury was instructed on two predicates for capital murder: robbery with a deadly weapon and abduction with intent to defile.[44] On state habeas, the Virginia Supreme Court rejected as procedurally barred petitioner's challenge to this jury instruction on the ground that "abduction with intent to defile" was not a predicate for capital murder for a victim over the age of 12.[45] That issue is not before us. Even assuming, however, that this predicate was erroneous, armed robbery still would have supported the capital murder conviction.

Petitioner argues that the prosecution's evidence on armed robbery "flowed almost entirely from inferences from Stoltzfus' testimony," and especially from her statement that Henderson had a "hard object" under his coat at the mall. Brief for Petitioner 35. That argument, however, ignores the fact that petitioner's mother and Tudor provided direct evidence that petitioner had a knife with him on the day of the crime.

---

[44] The trial court instructed the jury that, to convict petitioner of capital murder, it must find beyond a reasonable doubt that (1) "the defendant killed Leanne Whitlock"; (2) "the killing was willful, deliberate and premeditated"; and (3) "the killing occurred during the commission of robbery while the defendant was armed with a deadly weapon, or occurred during the commission of abduction with intent to extort money or a pecuniary benefit or with the intent to defile or was of a person during the commission of, or subsequent to, rape." *Strickler* v. *Murray*, 249 Va. 120, 124–125, 452 S. E. 2d 648, 650 (1995).

[45] In its motion to dismiss petitioner's state habeas petition, the Commonwealth conceded that the instruction on intent to defile was erroneously given in this case as a predicate for capital murder. App. 218.

In addition, the prosecution contended in its closing argument that the rock—not the knife—was the murder weapon.[46] The prosecution did advance the theory that petitioner had a knife when he got in the car with Whitlock, but it did not specifically argue that petitioner used the knife during the robbery.[47]

Petitioner also maintains that he suffered prejudice from the failure to disclose the Stoltzfus documents because her testimony impacted on the jury's decision to impose the death penalty. Her testimony, however, did not relate to his eligibility for the death sentence and was not relied upon by the prosecution at all during its closing argument at the penalty phase.[48] With respect to the jury's discretionary decision to impose the death penalty, it is true that Stoltzfus described petitioner as a violent, aggressive person, but that portrayal surely was not as damaging as either the evidence that he spent the evening of the murder dancing and drinking at Dice's or the powerful message conveyed by the 69-

---

[46] In his closing argument, the prosecutor stated that there was "really no doubt about where it happened and what the murder weapon was. It was not a gun, it wasn't a knife. It was this thing here, it is to[o] big to be called a rock and to[o] small to be called a boulder." *Id.,* at 167.

[47] The instructions given to the jury defined a deadly weapon as "any object or instrument that is likely to cause death or great bodily injury because of the manner and under the circumstance in which it is used." *Id.,* at 160.

[48] The jury recommended death after finding the predicates of "future dangerousness" and "vileness." Neither of these predicates depended on Stoltzfus' testimony. The trial court instructed the jury, "Before the penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt at least one of the following two alternatives. One, that after consideration of his history and background, there is a probability that he would commit criminal acts of violence that would constitute a continuing, continuing serious threat to society or two, that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman and that it involved torture, depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder." Tr. 899–900.

pound rock that was part of the record before the jury. Notwithstanding the obvious significance of Stoltzfus' testimony, petitioner has not convinced us that there is a reasonable probability that the jury would have returned a different verdict if her testimony had been either severely impeached or excluded entirely.

Petitioner has satisfied two of the three components of a constitutional violation under *Brady:* exculpatory evidence and nondisclosure of this evidence by the prosecution. Petitioner has also demonstrated cause for failing to raise this claim during trial or on state postconviction review. However, petitioner has not shown that there is a reasonable probability that his conviction or sentence would have been different had these materials been disclosed. He therefore cannot show materiality under *Brady* or prejudice from his failure to raise the claim earlier. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE SOUTER, with whom JUSTICE KENNEDY joins as to Part II, concurring in part and dissenting in part.

I look at this case much as the Court does, starting with its view in Part III (which I join) that Strickler has shown cause to excuse the procedural default of his *Brady* claim. Like the Court, I think it clear that the materials withheld were exculpatory as devastating ammunition for impeaching Stoltzfus.[1] See *ante,* at 282. Even on the question of preju-

---

[1] The Court notes that the District Court did not resolve whether all eight of the Stoltzfus documents had been withheld, as Strickler claimed, or only five. For purposes of its decision granting summary judgment for Strickler, the District Court assumed that only five had not been disclosed. See *ante,* at 290, 279. The Court of Appeals also left the dispute unresolved, see App. 418, n. 8, though granting summary judgment for respondent based on a lack of prejudice would presumably have required that court to assume that all eight documents had been withheld. Because this Court affirms the grant of summary judgment for respondent based on lack of prejudice and because it relies on at least one of the

dice or materiality,[2] over which I ultimately part company with the majority, I am persuaded that Strickler has failed to establish a reasonable probability that, had the materials withheld been disclosed, he would not have been found guilty of capital murder. See *ante*, at 292–296. As the Court says, however, the prejudice enquiry does not stop at the conviction but goes to each step of the sentencing process: the jury's consideration of aggravating, death-qualifying facts, the jury's discretionary recommendation of a death sentence if it finds the requisite aggravating factors, and the judge's discretionary decision to follow the jury's recommendation. See *ante*, at 294–296. It is with respect to the penultimate step in determining the sentence that I think Strickler has carried his burden. I believe there is a reasonable probability (which I take to mean a significant possibility) that disclosure of the Stoltzfus materials would have led the jury to recommend life, not death, and I respectfully dissent.

I

Before I get to the analysis of prejudice I should say something about the standard for identifying it, and about the unfortunate phrasing of the shorthand version in which the standard is customarily couched. The Court speaks in terms of the familiar, and perhaps familiarly deceptive, formulation: whether there is a "reasonable probability" of a different outcome if the evidence withheld had been disclosed. The Court rightly cautions that the standard in-

---

disputed documents in its analysis, see *ante*, at 282, I understand it to have assumed that none of the eight documents was disclosed. I proceed based on that assumption as well. If one thought the difference between five and eight documents withheld would affect the determination of prejudice, a remand to resolve that factual question would be necessary.

[2] In keeping with suggestions in a number of our opinions, see *Schlup* v. *Delo*, 513 U. S. 298, 327, n. 45 (1995); *Sawyer* v. *Whitley*, 505 U. S. 333, 345 (1992), the Court treats the prejudice enquiry as synonymous with the materiality determination under *Brady* v. *Maryland*, 373 U. S. 83 (1963). See *ante*, at 282, 288–289, 296. I follow the Court's lead.

tended by these words does not require defendants to show that a different outcome would have been more likely than not with the suppressed evidence, let alone that without the materials withheld the evidence would have been insufficient to support the result reached. See *ante*, at 289–290; *Kyles v. Whitley*, 514 U. S. 419, 434–435 (1995). Instead, the Court restates the question (as I have done elsewhere) as whether "'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence'" in the outcome. *Ante*, at 290 (quoting *Kyles, supra*, at 435).

Despite our repeated explanation of the shorthand formulation in these words, the continued use of the term "probability" raises an unjustifiable risk of misleading courts into treating it as akin to the more demanding standard, "more likely than not." While any short phrases for what the cases are getting at will be "inevitably imprecise," *United States v. Agurs*, 427 U. S. 97, 108 (1976), I think "significant possibility" would do better at capturing the degree to which the undisclosed evidence would place the actual result in question, sufficient to warrant overturning a conviction or sentence.

To see that this is so, we need to recall *Brady*'s evolution since the appearance of the rule as originally stated, that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U. S. 83, 87 (1963). *Brady* itself did not explain what it meant by "material" (perhaps assuming the term would be given its usual meaning in the law of evidence, see *United States v. Bagley*, 473 U. S. 667, 703, n. 5 (1985) (Marshall, J., dissenting)). We first essayed a partial definition in *United States v. Agurs, supra,* where we identified three situations arguably within the ambit of *Brady* and said that in the first, involving knowing use of perjured testi-

mony, reversal was required if there was "any reasonable likelihood" that the false testimony had affected the verdict. *Agurs, supra,* at 103 (citing *Giglio* v. *United States,* 405 U. S. 150, 154 (1972), in turn quoting *Napue* v. *Illinois,* 360 U. S. 264, 271 (1959)). We have treated "reasonable likelihood" as synonymous with "reasonable possibility" and thus have equated materiality in the perjured-testimony cases with a showing that suppression of the evidence was not harmless beyond a reasonable doubt. *Bagley, supra,* at 678–680, and n. 9 (opinion of Blackmun, J.). See also *Brecht* v. *Abrahamson,* 507 U. S. 619, 637 (1993) (defining harmless-beyond-a-reasonable-doubt standard as no "'reasonable possibility' that trial error contributed to the verdict"); *Chapman* v. *California,* 386 U. S. 18, 24 (1967) (same). In *Agurs,* we thought a less demanding standard appropriate when the prosecution fails to turn over materials in the absence of a specific request. Although we refrained from attaching a label to that standard, we explained it as falling between the more-likely-than-not level and yet another criterion, whether the reviewing court's "'conviction [was] sure that the error did not influence the jury, or had but very slight effect.'" 427 U. S., at 112 (quoting *Kotteakos* v. *United States,* 328 U. S. 750, 764 (1946)). Finally, in *United States* v. *Bagley, supra,* we embraced "reasonable probability" as the appropriate standard to judge the materiality of information withheld by the prosecution whether or not the defense had asked first. *Bagley* took that phrase from *Strickland* v. *Washington,* 466 U. S. 668, 694 (1984), where it had been used for the level of prejudice needed to make out a claim of constitutionally ineffective assistance of counsel. *Strickland* in turn cited two cases for its formulation, *Agurs* (which did not contain the expression "reasonable probability") and *United States* v. *Valenzuela-Bernal,* 458 U. S. 858, 873–874 (1982) (which held that sanctions against the Government for deportation of a potential defense witness were appropriate only

if there was a "reasonable likelihood" that the lost testimony "could have affected the judgment of the trier of fact").

The circuitous path by which the Court came to adopt "reasonable probability" of a different result as the rule of *Brady* materiality suggests several things. First, while "reasonable possibility" or "reasonable likelihood," the *Kotteakos* standard, and "reasonable probability" express distinct levels of confidence concerning the hypothetical effects of errors on decisionmakers' reasoning, the differences among the standards are slight. Second, the gap between all three of those formulations and "more likely than not" is greater than any differences among them. Third, because of that larger gap, it is misleading in *Brady* cases to use the term "probability," which is naturally read as the cognate of "probably" and thus confused with "more likely than not," see *Morris* v. *Mathews*, 475 U. S. 237, 247 (1986) (apparently treating "reasonable probability" as synonymous with "probably"); *id.*, at 254, n. 3 (Blackmun, J., concurring in judgment) (cautioning against confusing "reasonable probability" with more likely than not). We would be better off speaking of a "significant possibility" of a different result to characterize the *Brady* materiality standard. Even then, given the soft edges of all these phrases,[3] the touchstone of the enquiry

---

[3] Each of these phrases or standards has been used in a number of contexts. This Court has used "reasonable possibility," for example, in defining the level of threat of injury to competition needed to make out a claim under the Robinson-Patman Act, see, *e. g., Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U. S. 209, 222 (1993); the standard for judging whether a grand jury subpoena should be quashed under Federal Rule of Criminal Procedure 17(c), see *United States* v. *R. Enterprises, Inc.*, 498 U. S. 292, 301 (1991); and the debtor's burden in establishing that certain collateral is necessary to reorganization and thus exempt from the Bankruptcy Code's automatic stay provision, see *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 375–376 (1988). We have adopted the standard established in *Kotteakos* v. *United States*, 328 U. S. 750 (1946), for determining the harmlessness of nonconstitutional errors on direct review as the criterion for the harmlessness enquiry concerning constitutional errors on collateral review. See *Brecht* v. *Abra-*

must remain whether the evidentiary suppression "undermines our confidence" that the factfinder would have reached the same result.

## II

Even keeping in mind these caveats about the appropriate level of materiality, applying the standard to the facts of this case does not give the Court easy answers, as the Court candidly acknowledges. See *ante,* at 289. Indeed, the Court concedes that discrediting Stoltzfus's testimony "might have changed the outcome of the trial," *ibid.,* and that the District Court was "surely correct" to find a "reasonable *possibility* that either a total, or just a substantial, discount of Stoltzfus' testimony might have produced a different result, either at the guilt or sentencing phases," *ante,* at 291.

In the end, however, the Court finds the undisclosed evidence inadequate to undermine confidence in the jury's sen-

---

*hamson,* 507 U. S. 619, 637–638 (1993). We have used "reasonable probability" to define the plaintiff's burden in making out a claim under § 7 of the Clayton Act, see, *e. g., Brown Shoe Co.* v. *United States,* 370 U. S. 294, 325 (1962); *FTC* v. *Morton Salt Co.,* 334 U. S. 37, 55–61 (1948) (Jackson, J., dissenting in part) (contrasting "reasonable possibility" and "reasonable probability" and arguing for latter as appropriate standard under Robinson-Patman Act); the standard for granting certiorari, vacating, and remanding in light of intervening developments, see, *e. g., Lawrence* v. *Chater,* 516 U. S. 163, 167 (1996) *(per curiam);* and the standard for exempting organizations from otherwise valid disclosure requirements in light of threats or harassment resulting from the disclosure, see, *e. g., Buckley* v. *Valeo,* 424 U. S. 1, 74 (1976) *(per curiam).* We have recently used "significant possibility" in explaining the circumstances under which nominal compensation is an appropriate award in a suit under the Longshore and Harbor Workers' Compensation Act, see *Metropolitan Stevedore Co.* v. *Rambo,* 521 U. S. 121, 123 (1997), but we most commonly use that term in defining one of the requirements for the granting of a stay pending certiorari. The three-part test requires a "reasonable probability" that the Court will grant certiorari or note probable jurisdiction, a "significant possibility" that the Court will reverse the decision below, and a likelihood of irreparable injury absent a stay. See, *e. g., Barefoot* v. *Estelle,* 463 U. S. 880, 895 (1983); *Packwood* v. *Senate Select Comm. on Ethics,* 510 U. S. 1319 (1994) (REHNQUIST, C. J., in chambers).

tencing recommendation, whereas I find it sufficient to do that. Since we apply the same standard to the same record, our differing conclusions largely reflect different assessments of the significance the jurors probably ascribed to the Stoltzfus testimony. My assessment turns on two points. First, I believe that in making the ultimate judgment about what should be done to one of several participants in a crime this appalling the jurors would very likely have given weight to the degree of initiative and leadership exercised by that particular defendant. Second, I believe that no other testimony comes close to the prominence and force of Stoltzfus's account in showing Strickler as the unquestionably dominant member of the trio involved in Whitlock's abduction and the aggressive and moving figure behind her murder.

Although Stoltzfus was not the prosecution's first witness, she was the first to describe Strickler in any detail, thus providing the frame for the remainder of the story the prosecution presented to the jury. From the start of Stoltzfus's testimony, Strickler was "Mountain Man" and his male companion "Shy Guy," labels whose repetition more than a dozen times (by the prosecutor as well as by Stoltzfus) must have left the jurors with a clear sense of the relative roles that Strickler and Henderson played in the crimes that followed Stoltzfus's observation. According to her, when she first saw Strickler she "just sort of instinctively backed up because I was frightened." App. 36. Unlike retiring "Shy Guy," Strickler was "revved up." *Id.*, at 39, 60. Even in describing her first encounter with Strickler inside the mall, Stoltzfus spoke of him as domineering, a "very impatient" character yelling at his female companion, "Blonde Girl," to join him. *Id.*, at 36, 38–39.

After describing in detail how "Mountain Man" and "Blonde Girl" were dressed, Stoltzfus said that " 'Mountain Man' came tearing out of the Mall entrance door and went up to the driver of [a] van and . . . was just really mad and ran back and banged on back of the backside of the van"

while "Shy Guy" and "Blonde Girl" hung back. *Id.*, at 43. "Mountain Man" approached a pickup truck, then "pounded on" the front passenger side window of Whitlock's car, "shook and shook the car door," "banging and banging on the window" while Whitlock checked to see if the door was locked. *Ibid.* Finally, "he just really shook it hard and you could tell he was mad. Shook it really hard and the door opened and he jumped in . . . and faced her." *Id.*, at 43–44. While Whitlock tried to push him away, "Mountain Man" "motioned for 'Blonde Girl' and 'Shy Guy' to come" and the girl did as she was bidden. She "started to jump into the car," but "jumped back" when Whitlock stepped on the gas. *Id.*, at 44. Then "Mountain Man" started "hitting [Whitlock] on the left shoulder, her right shoulder and then . . . the head," finally "open[ing] the door again" so "the 'Blonde Girl' got in the back and 'Shy Guy' followed and got behind him." *Id.*, at 45. "Shy Guy" passed "Mountain Man" his tan coat, which "Mountain Man" "fiddled with" for "what seemed like a long time," then "sat back up and . . . faced" Whitlock while "the other two in the back seat sat back and relaxed." *Ibid.* Stoltzfus then claimed that she got out of her car and went over to Whitlock's, whereupon unassertive "Shy Guy" "instinctively jumped, you know, laid over on the seat to hide from me." *Id.*, at 46. Stoltzfus pulled up next to Whitlock's car and repeatedly asked, "[A]re you O.K.[?]," but Whitlock responded only with eye contact; "she didn't smile, there was no expression," and "[j]ust very serious, looked down to her right," suggesting Strickler was holding a weapon on her. *Id.*, at 46, 47. Finally, Whitlock mouthed something, which Stoltzfus demonstrated for the jury and then explained she realized must have been the word, "help." *Id.*, at 47.

Without rejecting the very notion that jurors with discretion in sentencing would be influenced by the relative dominance of one accomplice among others in a shocking crime, I could not regard Stoltzfus's colorful testimony as anything but significant on the matter of sentence. It was Stoltzfus

alone who described Strickler as the initiator of the abduction, as the one who broke into Whitlock's car, who beckoned his companions to follow him, and who violently subdued the victim while "Shy Guy" sat in the back seat. The bare content of this testimony, important enough, was enhanced by one of the inherent hallmarks of reliability, as Stoltzfus confidently recalled detail after detail. The withheld documents would have shown, however, that many of the details Stoltzfus confidently mentioned on the stand (such as Strickler's appearance, Whitlock's appearance, the hour of day when the episode occurred, and her daughter's alleged notation of the license plate number of Whitlock's car) had apparently escaped her memory in her initial interviews with the police. Her persuasive account did not come, indeed, until after her recollection had been aided by further conversations with the police and with the victim's boyfriend. I therefore have to assess the likely havoc that an informed cross-examiner could have wreaked upon Stoltzfus as adequate to raise a significant possibility of a different recommendation, as sufficient to undermine confidence that the death recommendation would have been the choice. All it would have taken, after all, was one juror to hold out against death to preclude the recommendation actually given.

The Court does not, of course, deny that evidence of dominant role would probably have been considered by the jury; the Court, instead, doubts that this consideration, and the evidence bearing on it, would have figured so prominently in a juror's mind as to be a fulcrum of confidence. I am not convinced by the Court's reasons.

The Court emphasizes the brutal manner of the killing and Strickler's want of remorse as jury considerations diminishing the relative importance of Strickler's position as ringleader. See *ante*, at 295–296. Without doubt the jurors considered these to be important factors, and without doubt they may have been treated as sufficient to warrant death. But as the Court says, sufficiency of other evidence and the

facts it supports is not the *Brady* standard, and the significance of both brutality and sangfroid must surely have been complemented by a certainty that without Strickler there would have been no abduction and no ensuing murder.

The Court concludes that Stoltzfus's testimony is unlikely to have had significant influence on the jury's sentencing recommendation because the prosecutor made no mention of her testimony in his closing statement at the sentencing proceeding. See *ante*, at 295. But although the Court is entirely right that the prosecution gave no prominence to the Stoltzfus testimony at the sentencing stage, the Commonwealth's closing actually did include two brief references to Strickler's behavior in "just grabbing a complete stranger and abducting her," 19 Record 919; see also *id.*, at 904, as relevant to the jury's determination of future dangerousness. And since Strickler's criminal record had no convictions involving actual violence, a point defense counsel stressed in his closing argument, see *id.*, at 913, the jurors may well have given weight to Stoltzfus's lively portrait of Strickler as the aggressive leader of the group when they came to assess his future dangerousness.

What is more important, common experience, supported by at least one empirical study, see Bowers, Sandys, & Steiner, Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt-Trial Experience, and Premature Decision Making, 83 Cornell L. Rev. 1476, 1486–1496 (1998), tells us that the evidence and arguments presented during the guilt phase of a capital trial will often have a significant effect on the jurors' choice of sentence. True, Stoltzfus's testimony directly discussed only the circumstances of Whitlock's abduction, but its impact on the jury was almost certainly broader, as the prosecutor recognized. After the jury rendered its verdict on guilt, for example, the defense moved for a judgment of acquittal on the capital murder charge based on insufficiency of the evidence. In the prosecutor's argument to the court he replied that

> "the evidence clearly shows that this man was the aggressor. He was the one that ran out. He was the one that grabbed Leanne Whitlock. When she struggled trying to get away from him . . . , he was the one that started beating her there in the car. And finally subdued her enough to make her drive away from the mall, so you start with the principle that he is the aggressor." 20 Record 15.

Stoltzfus's testimony helped establish the "principle," as the prosecutor put it, that Strickler was "the aggressor," the dominant figure, in the whole sequence of criminal events, including the murder, not just in the abduction. If the defense could have called Stoltzfus's credibility into question, the jurors' belief that Strickler was the chief aggressor might have been undermined to the point that at least one of them would have hesitated to recommend death.

The Court suggests that the jury might have concluded that Strickler was the leader based on three other pieces of evidence: Kurt Massie's identification of Strickler as the driver of Whitlock's car on its way toward the field where she was killed; Donna Tudor's testimony that Strickler kept the car the following week; and Tudor's testimony that Strickler threatened Henderson with a knife later on the evening of the murder. But if we are going to look at other testimony we cannot stop here. The accuracy of both Massie's and Tudor's testimony was open to question,[4] and all of it was subject to some evidence that Henderson had taken a major role in the murder. The Court has quoted the Dis-

---

[4] Massie's identification was open to some doubt because it occurred at night as one car passed another on a highway. Moreover, he testified that he first saw four people in the car, then only three, and that none of the occupants was black. App. 66–67, 70–73. Tudor, as defense counsel brought out on cross-examination, testified pursuant to a cooperation agreement with the government and admitted that the story she told on the stand was different from what she had told the defense investigator before trial. Id., at 100–101, 103–104.

trict Court's summation of evidence against him, *ante*, at 291, n. 36: Henderson's wallet was found near the body, his clothes were bloody, he presented a woman friend with the victim's watch at a postmortem celebration (which he left driving the victim's car), and he confessed to a friend that he had just killed an unidentified black person. Had this been the totality of the evidence, the jurors could well have had little certainty about who had been in charge. But they could have had no doubt about the leader if they believed Stoltzfus.

Ultimately, I cannot accept the Court's discount of Stoltzfus in the *Brady* sentencing calculus for the reason I have repeatedly emphasized, the undeniable narrative force of what she said. Against this, it does not matter so much that other witnesses could have placed Strickler at the shopping mall on the afternoon of the murder, *ante*, at 293–294, or that the Stoltzfus testimony did not directly address the aggravating factors found, *ante*, at 295. What is important is that her evidence presented a gripping story, see E. Loftus & J. Doyle, Eyewitness Testimony: Civil and Criminal 5 (3d ed. 1997) ("[R]esearch redoundingly proves that the story format is a powerful key to juror decision making"). Its message was that Strickler was the madly energetic leader of two morally apathetic accomplices, who were passive but for his direction. One cannot be reasonably confident that not a single juror would have had a different perspective after an impeachment that would have destroyed the credibility of that story. I would accordingly vacate the sentence and remand for reconsideration, and to that extent I respectfully dissent.