**David RANTA, Petitioner–Appellant,**

v.

**Floyd BENNETT, Respondent–Appellee.**

No. 00–2364.

United States Court of Appeals, Second Circuit.

Aug. 23, 2006.

David L. Lewis, Lewis & Fiore, New York, NY, for Petitioner–Appellant.

Leonard Joblove, Assistant District Attorney (Jane S. Meyers and Anthea H. Bruffee, Assistant District Attorneys, on the brief) for Charles J. Hynes, District Attorney, Kings County, Brooklyn, NY, for Respondent–Appellee.

Present PIERRE N. LEVAL, ROBERT A. KATZMANN, Circuit Judges and JANET BOND ARTERTON, District Judge.*

## SUMMARY ORDER

We assume the parties' familiarity with the facts and procedural history of this case. In brief, Petitioner–Appellant David Ranta ("Ranta") was convicted on May 22, 1991 on two counts of murder in the second degree and of first degree robbery and attempted robbery in connection with the killing of Rabbi Haskel Werzberger following the attempted robbery of jewelry courier Chaim Weinberger in the Williamsburg section of Brooklyn on February 8, 1990.

Following his conviction, Ranta filed, inter alia, a motion to vacate pursuant to N.Y.C.P.L. § 440.10 on grounds that included alleged violations of the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, as well as newly discovered evidence in the form of an affidavit from Theresa Astin ("Theresa"). Theresa asserted that her deceased husband Joseph Astin ("Astin") had confessed to her shortly before his death that he had shot a man following a failed robbery attempt of a jewelry courier in Brooklyn on February 8, 1990. The State court summarily denied the *Brady* claim but granted a hearing, which included testimony from Theresa, on the newly discovered evidence claim. Ultimately, that court denied the

motion to vacate, concluding that Ranta had failed to prove by a preponderance of the evidence that Theresa's testimony would "probably change the result if a new trial [were] granted."

Ranta subsequently filed a petition in federal court for a writ of habeas corpus on the basis of the alleged *Brady* violation, which petition the district court denied in an extensive opinion, from which Ranta now appeals. See *Ranta v. Bennett*, 97–civ–2169, 2000 WL 1100082 (E.D.N.Y. May 23, 2000) (Korman, J.).

The appeal is focused on the alleged nondisclosure, or belated disclosure, of material concerning Astin, which if disclosed might have caused the defense to make inquiries of Theresa Astin, which might have led to her testifying to her husband's confession that he had shot a man in the robbery.[1] The district court determined that this material fell within the scope of the prosecution's *Brady* obligation but that Ranta had not met his burden under *Brady* of demonstrating a "reasonable probability" that such material, if timely disclosed, would have changed the verdict. Specifically, the district court concluded that even if the Astin material had been timely disclosed, Theresa Astin likely could not have been convinced to testify, and so did not decide whether the jury would have found Theresa's testimony to be credible evidence of Ranta's innocence. Further, as to the Astin material that was not disclosed (such as evidence of Astin's physical appearance, including photographs,

---

* The Honorable Janet Bond Arterton, United States District Judge for the District of Connecticut, sitting by designation.

1. Ranta's *Brady* violation claim also addressed two other categories of material: (1) material relating to prosecution witnesses Alan Bloom, Cheryl Herbert, and Alison Picciano "that, if timely disclosed, would have undermined the credibility of each of those witnesses' testimony and resulted in a different verdict;" and (2) an audiotape of Ranta's

second pretrial identification lineup, timely disclosure of which "would have resulted in the suppression at the pretrial hearing of the identifications made at that lineup, which ultimately would have resulted in a different verdict." *Id.* at * 13. The district court granted a limited certificate of appealability of its denial of Ranta's petition "only to the extent that [it] arises from the undisclosed Astin material[ ]." *Id.* at *40.

and his criminal history of armed robbery), the district court concluded that "[i]f there is reason to doubt whether Theresa's testimony would have affected the verdict had she testified, it seems inconceivable that anything less would have undermined the compelling force of the evidence against [Ranta]," *id.* at *22, which included Ranta's own confessions to police concerning his involvement in the attempted robbery and murder, the testimony of three eyewitnesses placing him at the scene of the crime, the testimony of Bloom (a co-conspirator) who identified Ranta as the shooter of Rabbi Werzberger, and the testimony of Herbert and Picciano as to incriminating confessions made to them by Ranta.[2] The district court also determined that, even if introduction of the Astin material at trial would have "raised a reasonable doubt among the jurors as to whether [Ranta] was the *shooter*, none of that evidence would have operated directly to rebut the testimony of Bloom, Herbert and Picciano indicating that [Ranta] was, if not the shooter, at least an *accomplice* to the crimes," which theory Ranta corroborated by his own statements to the police. *Id.* at *23.

We review the district court's denial of Ranta's petition for writ of habeas corpus de novo. See *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir.2002).

*Brady* and its progeny require that:

To the extent that the prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant.... Information coming within the scope of this principle ... includes not only evidence that is exculpatory, i.e., going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, i.e., having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.

*United States v. Avellino*, 136 F.3d 249, 255 (2d Cir.1998) (citing, inter alia, *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Kyles v. Whitley*, 514 U.S. 419, 431, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). In order to succeed on a *Brady* violation claim: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State; and (3) prejudice must have ensued.[3] *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). In *Kyles*, the Supreme Court discussed the third requirement, noting that prejudice is established if the suppressed evidence is "material" and the "touchstone of materiality is a 'reasonable probability' of a different result.... The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 514 U.S. at 434, 115 S.Ct. 1555 (citing *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). *Kyles* also provided that in assessing materiality, suppressed evidence must be considered "collectively, not item by item." *Id.* at 436, 115 S.Ct. 1555.

---

2. The district court also considered and rejected Ranta's argument that disclosure of the Astin material would have permitted defense counsel to discredit the testifying police detectives by cross-examining them about their investigation of Astin, reasoning "the conduct of the police investigation was at best a two-edged sword because of the extensive efforts made by the police to implicate Astin as the shooter, which included apprising Theresa of the $20,000 reward." *Id.* at *22.

3. We assume without deciding that the *Brady* obligation extended to the Astin material.

The import of the claimed *Brady* material is focused on the potential testimony of Theresa Astin. However, as the district court recognized, Theresa's protracted delay in coming forward, her reasons for her delay, and her repeated refusals to sign an affidavit illustrate the probability that even if the purported *Brady* material had been disclosed, defense counsel would not have succeeded in persuading Theresa to testify voluntarily at Ranta's trial or, under compulsion, to the substance of her affidavit.

At the post-trial hearing held in state court, Theresa testified that when detectives visited her in April 1990 after her husband's death, she refused to give them any information, even after being informed of the $20,000 reward; the detectives left a card, but she never contacted them. Theresa also testified that she anonymously called Ranta's attorney, Michael Baum, after Ranta's conviction, but would not give him her name or identify the person she believed was the true perpetrator. In June 1992, Theresa finally spoke to Baum and gave him the information about her husband, but refused to sign an affidavit. She testified that Baum would call "[e]very so often" to see if she was willing to sign an affidavit, but she would tell him that she spoke to Baum's investigator (Allison Miller), "and we were going to wait to hear on [Ranta's] appeal." Baum testified that in July 1992 he told Theresa that her information was very important and that he thought it could help Ranta, who he believed was innocent, but Theresa refused to sign an affidavit then, and repeatedly throughout the following three years. In-

deed, Theresa initially told Baum in July 1992 that "if she was called to the stand, she would deny it. She would say she was on drugs at the time, and she didn't know what we're talking about." Finally, in April 1995, the day after Baum represented her pro bono in a criminal proceeding, more than five years after her husband's death, nearly four years after Ranta's conviction, and almost three years after she first spoke with Baum, Theresa finally agreed to sign an affidavit.

Additionally, many of Theresa's reasons for her recalcitrance, both in speaking to Baum and in signing an affidavit, would have been applicable at the time of Ranta's trial, even if Attorney Baum had known to contact her pre-trial. In particular, Theresa testified that she was frightened of retribution from her husband's accomplices, she was embarrassed to have her name in the paper and feared her daughter would be ridiculed at school, and she was concerned she could be subjected to liability for withholding information when questioned by detectives.[4]

Further, even if disclosure of the purported *Brady* material could have led to the favorable defense testimony by Theresa at trial that Astin was the shooter and not Ranta, Ranta has advanced no theory of the evidence that would undermine his own confession to police and admissions to two friends admitting his involvement, even if not as the shooter, in the crimes for which he was convicted.[5] As well, Theresa's testimony, even if obtained, would have suffered serious credibility flaws as detailed by the district court, and the oth-

---

**4.** As the district court correctly observed, had defense counsel been unable to retain Theresa's voluntary participation at trial, subpoenaing her would have been risky and the substance of such compelled testimony speculative, particularly because both the marital and Fifth Amendment privileges would have been available to Theresa to reduce her testimony to little, if any, significance.

**5.** The jury could have convicted Ranta even if it had concluded that he was only an accomplice to the crimes because "there is no legal distinction between liability as a principal and criminal culpability as an accomplice." *People v. Rivera*, 84 N.Y.2d 766, 769, 622 N.Y.S.2d 671, 646 N.E.2d 1098 (1995).

er Astin material—such as photographs of Astin [6] and Astin's prior criminal history of armed robbery—is relatively inconclusive in light of the overwhelming evidence supporting Ranta's guilt (Ranta's own confessions, the testimony of Bloom identifying Ranta as the shooter, the testimony of three eyewitnesses placing Ranta at the scene of the crime, and the testimony of Herbert and Picciano as to incriminating admissions Ranta made to them).[7]

In short, Ranta has not demonstrated a "reasonable probability" that, had the purported *Brady* material been timely disclosed, the verdict would have been different. Accordingly, for the foregoing reasons, the judgment of the district court is hereby **AFFIRMED.**

6. These photographs, while showing some similarities in appearance between Ranta and Astin, also reveal potentially significant differences in stature, coloring, and facial structure. Further, when taken to the morgue to view Astin's body after his death, Chaim Weinberger was unable to identify Astin as his attacker.

7. The credibility flaws of all of these witnesses were highlighted to the jury during trial and by defense counsel in closing argument and Ranta's conviction thus suggests that the jury found their testimony credible, notwithstanding these flaws.