ALICE M. BATCHELDER, Chief Judge,
concurring.
I concur in- the majority opinion, and write separately only to address the Brady claim. I think more emphasis needs to be given to the fact that the withheld police report on which Montgomery bases his *686 Brady claim could not have helped him at all. That is, neither the report itself nor the substance of that report could have caused the jury to have a reasonable doubt about the relevant issue here — whether Montgomery, rather than Heard, murdered Ogle. The police report at issue is simply immaterial to that question.
The only matter that the police report even purports to address is whether at approximately 1:20 a.m. on March 12,1986, Ogle was already dead. The only evidence that she was not is the statement in that police report that several of her classmates had just seen her, alive and well, as the passenger in a blue Ford Escort, driving through the parking lot of the Oak Hill Apartments where she shared an apartment with Tincher, the other victim. When that report came in, the police were aware of the great body of evidence that made the report wholly implausible. Within the next couple of days, the police knew that the report was not only implausible but just plain wrong.
Ogle had not appeared as scheduled for work on the morning of March 8, and her car was first noted that same morning, abandoned on the other side of town. The police had been exhaustively looking for her since their discovery of Tincher’s body and their further discovery that the door to the girls’ apartment was unlocked but no one was in the apartment. By the end of that day, the police had determined that Ogle was missing, and her parents began a series of daily appearances on television, pleading for information about their daughter and for her safe return.
On Sunday morning, March 9, the local newspaper reported Tincher’s death. Also that morning, the police recovered Ogle’s abandoned car. Her apartment keys and purse were in the car, and her car key was in the ignition. That evening, Ogle’s parents made another televised appeal for her safe return. By Monday, March 10, the police had begun to fear that, like Tincher, Ogle had been murdered. Detectives continued to question suspects in the Tincher murder and searched a field near the place where Tincher’s body had been found, hoping to find evidence that would lead them to Ogle. And Ogle’s parents appeared on television again that evening.
On Tuesday, March 11, Michael Clark, an inmate at the Lucas County Jail, told the police that on March 8, Glover Heard had bragged to him about witnessing the murder of two white girls, aged 19 and 20. Another inmate confirmed that Clark had told him about the March 8 conversation with Heard, and two corrections officers further confirmed the story. The police began to look for Heard while continuing an intensive search for Ogle. They did not find Ogle, but they did find Heard, and by 2:30 p.m. on March 11, Heard was in police custody. By 3:30 p.m., Heard’s alibi witness had implicated Montgomery and police went to look for him. At 4:35 p.m., Heard was formally arrested and booked for Tincher’s murder; he was transferred to the Lucas County Jail where he remained for all times relevant to this case. That evening, about 7:00 p.m., Montgomery’s mother consented to a police search of her residence — police found a black, hooded jacket (consistent with witness descriptions) and a manual for a .38 caliber handgun (consistent with the gun used to kill Tincher). Later that night, at about 12:30 a.m. on March 12, police executed a warrant to search Heard’s residence and found Ogle’s wallet, driver’s license, and credit cards.
By 1:20 a.m. on March 12, when the police received the call from David Ingram that he and several friends had seen Ogle driving around in the Ford Escort, Ogle’s status as a missing person had been in the newspapers and on television for three *687 days. Had Ogle been in the vicinity, she could hardly have escaped the knowledge that her roommate had been murdered and that she herself was the object of an intensive and very public search. But no one had heard a word from her. She had abandoned her job, her boyfriend, and her family without a single word. She had also abandoned her apartment, her car, and her wallet, including her driver’s license and credit cards.
By 11:30 p.m. on March 12, when Montgomery finally led them to Ogle’s body, he had given the police several versions of the events of March 8, including that Heard had admitted to killing both girls on the morning of March 8; that Montgomery did not know where Ogle’s body was; that Heard had killed the girls using Montgomery’s gun; and that the body was “on Hill Avenue near a market.” Directed by Montgomery, the police found the body in a wooded area near 4700 Hill Avenue. The following day, the Lucas County Coroner performed an autopsy, noting in the report that the gunshot wound that had caused Ogle’s death had been inflicted on March 8. The coroner also told the newspaper that Tincher and Ogle had likely died the same day (Saturday, March 8), but that it “may not be possible to determine [Ogle’s] precise time of death.”
To establish a Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), violation “[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued.” Strickler v. Greene, 527 U.S. 263, 282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). A showing of prejudice need not mean that the evidence would have led to an acquittal, but merely “a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).
Here, there is no reasonable probability that the withheld police report would have made any difference whatsoever in the course or outcome of Montgomery’s trial. The report itself is inadmissible hearsay, as even the now-vacated majority panel opinion conceded. And if Montgomery had called as witnesses David Ingram or any of the individuals who were with him when he reported seeing Ogle in the Ford Escort, there is no basis upon which to claim that they would have stood behind that report. They, in fact, realized that same night that they had seen Ogle’s sister and not Ogle riding around in the Escort, and they recanted the report when they learned years later that it had been the basis for granting habeas relief to Montgomery. But even if we were to assume that the report could have been utilized at trial, and that it would have been unrefuted, we cannot proceed to the assumption that it could have helped Montgomery in any way.
First, the report had Ogle still alive in the wee hours of March 12, 1986. Heard was in police custody at that time, and he remained in custody throughout that entire day and for a long time thereafter. Montgomery’s claim is, and always has been, that it was Heard who murdered Ogle and Tincher, not Montgomery. Heard, on the other hand, pled guilty to his role in the murders and gave the police a detailed account of the events leading up to the murders and the murders themselves. That is, Ogle could only have been alive and well on March 12 if Heard had fabricated his part in the murders, falsely *688 confessed, and inexplicably accepted a prison term of 15 years to life.
And there has never been any serious claim that anyone other than Montgomery or Heard was the killer. Rather, Montgomery and Heard agree entirely that one of the two of them shot both girls. The point of disagreement is which of them did so, and as to that, each of them simply points to the other. So if Ogle was not murdered until after 1:20 a.m. on March 12, for Heard to have done it, he would have had to commit the murder from his jail cell. Not likely. And if Heard could not have murdered Ogle on March 12, between 1:20 a.m. and 11:30 p.m. when Montgomery led the police to her body, then that leaves Montgomery to have done it. All of this begs the question, “How would using the information in the withheld police report, either as direct evidence or to impeach Heard’s testimony, have helped Montgomery?” The answer, of course, is “It wouldn’t.”
Second, there is simply no basis for the dissent’s suggestion that if he had known about the report, Montgomery might have been able to construct “additional potential defense theories.” With or without the report, such theories would have been constructed out of whole cloth. Heard’s version of the murders was that he and Montgomery went to the girls’ apartment early in the morning on March 8; they departed with Ogle shortly thereafter; they drove around for a bit before going to a field near the apartment; Montgomery ordered Ogle to park her car and get out; Montgomery took Ogle across the field and into the woods; Montgomery shot Ogle; Montgomery and Heard then left the scene in Ogle’s car and went back to the girls’ apartment; Montgomery went into the apartment; Heard took Ogle’s car and drove it some five miles to a location about a block from where he lived and abandoned it, taking her wallet and credit cards but leaving her purse and keys in the car. According to Heard, Montgomery persuaded Tincher to leave the apartment with him in Tincher’s car; Tincher drove a couple of miles to Angola Road and pulled over; Montgomery shot her in the head and killed her; Montgomery then fled the car on foot and went to his apartment about a quarter of a mile away. Despite numerous problems with Heard’s version of the murders — lack of motive, discrepancies between the eyewitnesses’ description of what the man seen fleeing Tincher’s car was wearing and what Montgomery was wearing, to name just a couple — what is important is that Heard sat on the witness stand and told the jury than he and Montgomery had committed the murders, that he had accepted punishment for his role, and that Montgomery had been the shooter.
During extensive police questioning, Montgomery never mentioned anyone else who might have been involved, or that Ogle might have been killed some time other than the morning of March 8. According to Montgomery, Heard had possession of Montgomery’s gun that morning because Montgomery was afraid of being checked by police. Heard and Montgomery went to Ogle’s apartment and got Ogle so she could drop them at Montgomery’s on her way to work. Montgomery says she dropped him off at his apartment; that Heard asked to keep the gun, but gave no reason, and Montgomery agreed; that Heard and Ogle left Montgomery’s apartment; that some time later, Heard came back to Montgomery’s apartment and told Montgomery that he had killed Ogle; and Heard either showed or described to Montgomery the location of Ogle’s body. Montgomery says that Heard convinced him to go back to the girls’ apartment and persuade Tincher — who did not know Heard as well as she knew Montgomery— *689 to come with them; that he did so; and that Heard and Tincher left the apartment in Tincher’s car and Montgomery left in Heard’s mother’s car, heading home. Heard rode with Tincher to the Angola Road location, shot her in the head, and ran across the field to Montgomery’s apartment, where he gave the gun back to Montgomery; Heard took his mother’s car and returned home; and Montgomery hid the gun.
It is beyond dispute that, upon his arrest at approximately noon on March 12, Montgomery knew the location of both the murder weapon and Ogle’s body. During a telephone conversation, while in custody, Montgomery directed his mother to the location of the hidden gun — she eventually retrieved it and delivered it to the police. And after protesting for hours that he did not know the location of the body, Montgomery eventually relented and led the police directly to it.
There are numerous holes and inconsistencies in the stories of both Heard and Montgomery. And there is overwhelming evidence that both Tincher and Ogle were murdered on the morning of Saturday, March 8. Moreover, the evidence is uncontroverted that Heard or Montgomery (or both) murdered Tincher and Ogle. There is not anywhere in this record any basis for theorizing that some third party happened on the scene and murdered these two girls, or, for that matter, any other “potential defense[s]” for Montgomery, no matter when Ogle died. All of this begs the question, “Why did Montgomery need to know about the police report in order to come up with some ‘additional potential defense theories’?” The dissent posits no answer to this question, but I suggest the answer is “He didn’t.”
The issue before us with regard to this Brady claim is whether, using the standard that we are required to use under AEDPA, and particularly as that standard has been most recently elucidated in Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), we can say that the Ohio Court of Appeals unreasonably concluded that the withheld police report did not undermine confidence in the outcome of the trial. It is important to emphasize that a state court’s application of Supreme Court precedent cannot be unreasonable — nor can the state court’s determination of the facts be unreasonable — simply because it is not based on speculation about the possible benefit to the habeas petitioner had the jury been able to consider an isolated piece of information that was overwhelmingly demonstrated by the evidence to be false. The Ohio Court of Appeals neither unreasonably applied Brady, nor unreasonably determined the facts in light of the evidence before it.