MERRITT, Circuit Judge,
dissenting.
The majority in this case conflates the standard applicable for materiality in Brady claims with the standard for prejudice in Strickland claims, in order to import the prosecution-friendly presumptions of regularity applicable to the latter. In so doing, it guts the Brady rule of any practical deterrent effect in all but the most unconscionably severe cases. It provides a disincentive for prosecutors to comply with the law. It has selected a particular inappropriate case for this doctrinal shift because it should not agree with the state court’s view that it was reasonable for the prosecutor to conceal the Ogle facts “in the face of overwhelming evidence presented at trial” that Montgomery killed Ogle on March 8, 1986. The evidence was not “overwhelming,” and the concealment was not reasonable. There is no way to know what the outcome of this would have been had the Ogle report been turned over to the defense promptly during the defense investigation, rather than concealed. I, therefore, respectfully dissent.
The withheld evidence in this case, as the District Court found, is a police report *691 indicating that witnesses saw the victim, Debra Ogle, alive on March 12, 1986, four days after the prosecutor claimed, and the jury ultimately found, that William Montgomery, not Grover Heard, killed her. That evidence is clearly exculpatory and should not have been concealed by the prosecutor for six years until post-conviction counsel found it by accident in a group of documents obtained under Ohio’s version of the Freedom of Information Act. In a case of blatant prosecutorial misconduct, no one has seriously contested the fact that the prosecutor suppressed the evidence simply because it was inconsistent with his theory of the case. The District Court concluded that the case should be retried in state court. We should not retry it here on appeal, as my colleagues suggest. Montgomery is entitled to a jury trial free of gross prosecutorial misconduct.
My colleagues in the majority, citing a series of ineffective assistance of counsel cases, make it clear that in their opinion the constitutional test for this textbook Brady violation is the same as in an ineffective assistance of counsel case. Beginning with Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the majority says that “guided by these principles [of the ineffective assistance of counsel cases] we must determine whether the Ohio courts unreasonably applied Brady....” In a nutshell, the majority’s error is that it adopts not the Brady principle’s strict rule but the more prosecution-friendly standard of Strickland, with its presumption of trial regularity. The majority is confusing two separate and distinct constitutional violations — a claim under the Sixth Amendment concerning the conduct of counsel for the defense, and a clear, bright-line rule of Due Process prohibiting counsel for the prosecution from concealing exculpatory evidence. On the one hand, Strickland requires a “strong presumption” in favor of the state that no irregularity took place. Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011) (“A court considering a claim of ineffective assistance must apply a ‘strong presumption’ that counsel’s representation was within the ‘wide range’ of reasonable professional assistance.”) (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052). The Strickland-Richter language says that “the standard for judging counsel’s representation is a most deferential one” Richter, 131 S.Ct. at 788.
Contrast this with the latest Brady case from the Supreme Court, Connick v. Thompson, — U.S. -, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). The majority in that case, relying on the ABA Model Rules of Professional Conduct, said that:
Among prosecutors’ unique ethical obligations is the duty to produce Brady evidence to the defense. An attorney who violates his or her ethical obligations is subject to professional discipline, including sanctions, suspension, and disbarment.... Prosecutors are not only equipped but also ethically bound to know what Brady entails and to perform legal research when they are uncertain.
Id. at 1362-63 (internal citations omitted). The Court then quotes from one state’s code of professional responsibility that distinguishes between the strict requirements for prosecutors and the quite different responsibility for private lawyers:
With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice: the prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. Further, a prosecutor should not intentionally avoid pursuit of evidence merely because he *692 believes it will damage the prosecution’s case or aid the accused.
Id. at 1362 n. 8. The dissent in Connick agrees that Brady is a binding rule that is “among the most basic safeguards” of a “criminal defendant’s fair trial right.” Id. at 1385 (Ginsburg, J., dissenting) (citing Cone v. Bell, 556 U.S. 449, 129 S.Ct. 1769, 1772, 173 L.Ed.2d 701 (2009)).
Thus, the majority in the instant case started its analysis by following a set of presumptions and vague standards favoring the state. Strickland instructs us to presume the absence of irregularity in the trial, but Brady — flatly forbidding the refusal to turn over information favorable to the defendant — teaches that the withholding of evidence is itself a grave irregularity. It is not only a legal requirement but a “unique ethical obligation,” a moral duty unlike any of the duties imposed by Strickland.
In short, as to the test for the materiality of exculpatory evidence, the vocabulary of the law is not and should not be the same as for ineffective assistance of counsel, as my colleagues say they believe. This is because the concealment of evidence is the fault of the state, not the defendant’s side of the case, as with ineffective assistance of counsel where the presumption of regularity is with the state and against the defendant. For this reason, and because there is no other signiflcant deterrent to prosecutorial misconduct of this type — which is widespread[1]— there should not be a presumption of trial regularity when it is discovered that exculpatory evidence has been withheld; if anything, there should be a fairly strong inference of materiality that the prosecution should have to overcome. If, as the Supreme Court states, prosecutors are bound to know and follow the Brady rule, and in fact do know its meaning, and even so they then conceal the exculpatory evidence from the defendant, the inference should be that they concealed it because they believed it would hurt their case. This fact should normally lead to a rebut-table presumption that the trial did not result “in a verdict worthy of confidence”- — -the test for materiality that applies to violations of the Brady rule, as set out in Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), and repeated in Strickler v. Greene, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (the question is whether the evidence puts the case “in such a different light [so] as to undermine confidence in the verdict”). As the Supreme Court has explained, the “probability of a different verdict,” as required by the majority in this case, is not the bottom line standard in Brady cases. See Strickler, 527 U.S. at 289-90, 119 S.Ct. 1936 (“The question is not whether the *693 defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” (internal citations omitted)).
The majority claims that when it says that it is following the principles of Strickland in deciding this Brady case, it does not mean to follow Strickland’s general presumption of reasonableness on the part of counsel. (Opinion, footnote 5.) But the majority’s failure to recognize and condemn the prosecutor’s obvious disregard of the Brady rule suggests a predisposition to find prosecutorial reasonableness in the face of prosecutorial misconduct. This predisposition to discount prosecutorial wrongdoing is like the presumption of reasonableness employed in Strickland. Instead, the court should assume that the prosecutor concealed the exculpatory information because he believed the jury verdict might well be different if it heard the undisclosed evidence. In a Brady case of concealed, exculpatory evidence, Strickland ’s presumption of reasonableness should become a presumption of unreasonableness. We should not use Strickland’s principles as a guide to deciding the standards to be followed in a Brady case.
While what remains of Brady after this case is difficult to discern, the message sent by this case to prosecutors in our Circuit is crystal clear: where a spin can be put on the available evidence against a defendant that the evidence is “overwhelming,” feel free to withhold evidence. It turns the jury trial from a search for the truth before administering retributive justice into a search for an excuse for prosecutorial misconduct after the jury trial is over. After all, even assuming that down the line the defendant somehow contrives, from within prison walls, to obtain the withheld evidence, he must overcome the presumption that his trial, absent the withheld exculpatory evidence, was nonetheless fair. This should prove impossible in all but the most egregious Brady cases, and the deterrent effect of Brady against prosecutorial malfeasance of this sort will be practically eliminated. Because of the importance of the Brady rule, because of the fact that it is a rule, not a set of vague standards or admonitions, and because of the need for real deterrence of such prosecutorial concealment and the widespread nature of the problem, the courts should not follow the lead of the majority in making the problem worse and more widespread.
And finally, I would point out that the majority’s characterization of the facts only serves to enhance the artificial presumption of this trial’s regularity. The majority offers six reasons why the evidence that “Montgomery shot Tincher and Ogle” was “overwhelming,” but none suffice definitively to establish Montgomery’s guilt, particularly to the exclusion of Glover Heard. Montgomery may have bought the murder weapon, but both men had access to it on the night in question. Both were seen by Montgomery’s uncle hours before the crime. Both admitted being at the girls’ apartment on March 8. Montgomery’s dripping jacket — which, incidentally, tested negative for the presence of blood — does not by itself “overwhelming[ly]” prove that he as opposed to Heard pulled the trigger. Montgomery may have ended up with the murder weapon, but so too did Heard end up with the fruits of this alleged robbery. Pursuant to a plea deal, Heard testified that he witnessed Montgomery shoot Ogle, but a detective testifying for the state recalled telling Heard he physically could not have seen this take place from the position Heard claimed to be within Ogle’s parked car. Montgomery showed police officers where Ogle’s body was, but consistently maintained that he *694 only knew the body’s location because Heard told him.
In sum, apart from Heard’s implausible testimony, the case against Montgomery was entirely circumstantial. Montgomery had no motive at all — indeed, the prosecution at times candidly conceded this fact, when not at other times inviting unsubstantiated and racially charged speculation that this African-American defendant may have had some sort of sexual interest in one of these white female victims. But his trial counsel put on no defense, relying instead only on the cross-examination of the state’s witnesses. Much of the defense’s closing argument was concerned with effectively apologizing for not putting up a defense, and desperately admonishing the jury not to hold that fact against Montgomery. One can only wonder whether, had his counsel known of the existence of some affirmatively exculpatory evidence, such as the testimony of witnesses who saw Ogle days after the prosecution claimed she was murdered — and perhaps combined it with other evidence, such as the coroner’s report stating that Ogle died on the day she was allegedly seen, not days before — a different result might have obtained in this case. We will never know, because the state made sure that did not happen. With that uncertainty in place, I cannot say that the jury’s verdict in this case is worthy of confidence, and so I would find the withheld evidence material, and affirm the granting of the writ by the District Court.

. There are a plethora of law review articles and symposia recounting the widespread nature of the prosecutorial malfeasance problem. See, e.g., Stephanos Bibas, Prosecutorial Regulation Versus Prosecutorial Accountability, 157 U. Pa. L.Rev. 959 (2009); Charles Ogletree, Judging Justly? Judicial Responsibility for Addressing Incompetent Counsel and Prosecutorial Misconduct in Death Penalty Cases, 20 T.M. Cooley L.Rev. 21 (2003); Welsh White, Curbing Prosecutorial Misconduct in Capital Cases, 39 Am.Crim. L.Rev. 1147 (2002); Fred C. Zacharias, The Professional Discipline of Prosecutors, 79 N.C. L.Rev. 721 (2001); Lyn M. Morton, Note, Seeking the Elusive Remedy for Prosecutorial Misconduct: Suppression, Dismissal, or Discipline?, 7 Geo. J. Legal Ethics 1083 (1994); Richard A. Rosen, Disciplinary Sanctions Against Prosecutors for Brady Violations: A Paper Tiger, 65 N.C. L.Rev. 693 (1987); see also Erwin Chemerinsky, Head in the Sand Over Prosecutorial Misconduct, National Law Journal, Apr. 25, 2011, available at http:// www.law.com/jsp/nlj7PubArticlePrinter FriendlyNLJ.jsp?id= 1202491215314 (noting that "[sjtudy after study has demonstrated serious prosecutorial misconduct at both the federal and state levels”).