# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

JEFFREY MICHAEL EASTOM,

    Defendant-Appellant.

UNPUBLISHED
March 24, 2015

No. 319494
Livingston Circuit Court
LC No. 12-020772-FH

Before: WILDER, P.J., and SERVITTO and STEPHENS, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of embezzlement of more than $100,000 under MCL 750.174(7). He was sentenced as a second habitual offender under MCL 769.10 to 30 months to 30 years' imprisonment. Defendant appeals by right. We affirm defendant's conviction but remand for proceedings consistent with this opinion.

## I. THE EMBEZZLEMENT SCHEME

Defendant is accused of orchestrating a multi-year embezzlement scheme. He was a manager at a company that assisted in the liquidation of excess inventory for General Motors (GM). He and his co-offenders illegally sold some of the excess inventory as scrap, embezzling more than $300,000 in the process.

GM conducted a program called Share the Spare (STS) out of a facility owned by a company called Ideal Setech (Ideal), in Howell, Michigan. Under the program, Ideal managed GM inventory for use at its future plants. Ideal managed the property housed at its facility as a trustee or custodian. When Ideal sold or scrapped GM inventory, the money gained belonged to GM. Beginning in 2007, Ideal disposed of millions of dollars of GM inventory in order to raise cash for GM during its bankruptcy.

Defendant worked for Ideal as a manager of the redistribution program, and was later promoted to manager of the STS program. In that role he was in charge of recommending which pieces of inventory were to be reused, sold, scrapped, or thrown away, and generating the corresponding pick lists. As a result, he was in the best position to understand the "big picture" of how inventory was coming in and out of Ideal, and the weaknesses inherent in that process. Kevin Bowles was hired by Ideal at the time of defendant's promotion and took over as manager

-1-

of the redistribution program. The manager of the redistribution program was in charge of the entire operation, including the physical facility where it was located and its security cameras. The redistribution program had numerous employees, including Joe Shuler, who worked as a "picker" in the warehouse.

Shuler and Bowles testified against defendant pursuant to plea bargains. Shuler said that defendant came to him and proposed getting rid of some of the precious metals Ideal was housing for GM. Thereafter, Shuler began taking inventory from the facility to a scrap yard. Defendant instructed him to take the materials after hours and to use certain doors, and explained how to avoid detection by security cameras. Shuler testified that defendant told him what pieces of inventory were most valuable, and that he was able to locate that inventory because defendant and Bowles would tell him when and where those items were shipped into the warehouse. Defendant and Bowles also manipulated the pick lists so that Shuler could go through the facility and gather inventory with high precious metal content. Bowles corroborated Shuler's testimony. He said that he and defendant would manipulate pick lists and assist Shuler in taking inventory from the facility. Once the property was sold or scrapped, Shuler would pay himself and defendant in cash. Shuler said he felt comfortable participating in the scheme because defendant was involved, and that if defendant had not been part of the scheme they would have been caught.

In January 2010, officers with the Michigan State Police executed search warrants at several residences, the scrap yard, and Ideal. They uncovered $761,992.77 worth of inventory that had yet to be sold or scrapped. They also uncovered records indicating that Shuler had cashed checks from the scrap yard totaling $309,181.29 between March 2008 and January 2010.

## II. PROSECUTORIAL MISCONDUCT

Defendant first argues that the prosecution denied him a fair trial by asking a series of leading questions, which he claims resulted in irrelevant and prejudicial evidence. We disagree.

To preserve a claim of prosecutorial misconduct, a defendant must object to the prosecution's allegedly improper conduct at trial. *People v Thomas*, 260 Mich App 450, 453-54; 678 NW2d 631 (2004). Here, defendant specifically objected to only one of the prosecution's allegedly leading questions, and to only one of the two instances in which the prosecution allegedly introduced irrelevant or inflammatory evidence. This Court reviews preserved claims of prosecutorial misconduct de novo to determine if the defendant was denied a fair and impartial trial. *Id.* If a claim is unpreserved, this Court will reverse only if it determines that, "although defendant was actually innocent, the plain error caused him to be convicted," or that the error "seriously affected the fairness, integrity, or public reputation of [the] judicial proceedings," regardless of his innocence. *Id.*

A prosecutor has two important, but often competing, obligations. He must "prosecute with earnestness and vigor," yet always ensure that justice be done. See *Cone v Bell*, 556 US 449, 469; 129 S Ct 1769; 173 L Ed 2d 701 (2009), *Strickler v Greene*, 527 US 263, 281; 119 S Ct 1936; 144 L Ed 2d 286 (1999). The prosecutor is not simply a party to the controversy. *Strickler*, 527 US at 281. He is a representative of "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Id.* As a result, both the lower

court and the prosecutor have a duty to ensure that the defendant receives a fair trial. *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996).

Under MRE 611(d)(1), leading questions are not to be used during direct examination unless they are necessary to develop a witness's testimony. While a prosecutor technically commits an error when he or she asks an improper leading question, such an error does not normally warrant reversal of a defendant's conviction. *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001). In order to warrant reversal, a defendant must show prejudice, or a "pattern of eliciting inadmissible testimony." *Id*.

Defendant recites a long list of allegedly improper leading questions asked by the prosecution. However, defendant only objected to one of those questions contemporaneously. The prosecution asked Bowles, "…there wouldn't have been a lot of oversight as to what happened once it was pulled off the shelf, right;" Bowles responded: "That's correct." Defense counsel objected, stating "Judge, at this point I've been pretty lenient on the leading questions." The prosecution agreed, stating "I was leading…I'll refrain." Thereafter, the prosecution moved on to a different subject and defendant never renewed his objection. Because the prosecution conceded that it had asked an improper question and moved on, it cannot be said that the prosecution's actions prejudiced defendant.

Next, defendant claims that the prosecution evaded the lower court's ruling, and utilized a series of leading questions, to elicit testimony from Detective Jeffery Yonker regarding defendant's role in the multi-offender embezzlement scheme. Yonker first testified that he had experience and training in multi-offender crimes. Defense counsel objected to the prosecution's attempt to elicit testimony from Yonker regarding the typical functions of a "ringleader," and whether defendant carried out any of those functions. In response, the lower court held that the prosecution could ask Yonker "what he believes," and what "he knows that fellow did." On redirect, Yonker agreed that in multi-offender situations there are often people better situated to insulate themselves from incriminating activity. He said these are typically people with access to property, money or narcotics who would leave the handling of those materials to someone else. Defendant again objected and after the lower court overruled the objection, Yonker characterized that type of criminal as a ringleader.

Defendant claims that this line of questioning usurped the role of the jury in determining what role, if any, defendant played in the embezzlement scheme, and that it was irrelevant, inflammatory, and prejudicial. These arguments are meritless. Contrary to defendant's first assertion, Yonker's testimony never usurped the role of the jury as fact finder because Yonker never actually characterized defendant as a ringleader. Rather, Yonker testified to the types of behaviors a "ringleader" exhibits in a multi-offender crime. Separately, Yonker testified to the types of activities defendant engaged in as part of the embezzlement scheme. The jury was still free to determine for itself whether defendant's activities rendered him the ringleader of the operation. This testimony was within the scope of Yonker's knowledge and comported with the lower court's ruling.

Similarly, Yonker's testimony was not irrelevant or prejudicial. Since defendant was always paid in cash and the case against him hinged primarily on the testimony of the co-offenders who benefited from testifying against defendant, that defendant may have insulated

himself by using others to more directly carry out the scheme was relevant to whether he was involved. Moreover, under Offense Variable 14, the lower court could have scored 10 points if it found that defendant "was a leader in a multi offender situation." MCL 777.44(1)(a). Therefore, the prosecution's attempt to elicit testimony regarding defendant's conduct and the typical criminal roles found in multi-offender situations was not irrelevant or used for a prejudicial purpose.

Next, defendant takes issue with several additional instances in which the prosecution allegedly asked improper leading questions but defendant failed to preserve by making a contemporaneous objection at trial. Even if defendant had preserved these issues, his claim would still fail because he cannot show that the prosecution carried out a "pattern of eliciting inadmissible testimony." *Watson*, 245 Mich App at 587. First, we note the overall length and complexity of this trial. Over the course of five days and more than 900 pages of transcripts, the prosecution had to fully explain a complex multi-offender embezzlement scheme. "[I]t is hard to find a trial where every question is exactly proper." *Id*. at 588. Defendant's list of ten or so instances where the prosecution used leading questions during direct examination hardly constitutes a pattern of improper conduct. Second, in none of the instances in which the prosecution used leading questions did it elicit inadmissible evidence. Defendant cites Shuler's testimony (1) that defendant learned that he was taking inventory from Ideal and asked if he could participate in the scheme, (2) that he and defendant were able to earn more money when Bowles was not involved because the money was spilt only two ways, and (3) that defendant instructed him how to avoid detection by coming in after hours and staying out of view of the security cameras. All of this testimony is relevant, as it directly relates to defendant's role in operating the embezzlement scheme, and defendant makes no claim that these statements are otherwise inadmissible. Similarly, defendant notes the testimony of two upper management employees regarding defendant's role as a custodian of GM property. This testimony is clearly relevant as it directly establishes an element of embezzlement, that defendant was a custodian of the embezzled property. Again, defendant does not claim that these statements were otherwise inadmissible. Because defendant cannot show that the prosecution's leading questions were part of a pattern of eliciting inadmissible evidence, defendant's claim fails.

Finally, defendant argues that the prosecution elicited inflammatory evidence when questioning Bowles about a suicide note that the Michigan State Police found at his home while executing a search warrant. Defendant claims this testimony was irrelevant because Bowles had already pleaded guilty to embezzlement. Thus, defendant argues, the prosecution introduced the testimony to insinuate that he caused Bowles to consider taking his own life. We disagree. Nowhere in the prosecution's direct examination does it suggest that defendant caused Bowles to contemplate suicide. Rather, the prosecution introduced the evidence to explain why Bowles eventually chose to help the Michigan State Police investigate the embezzlement scheme. Bowles testified that he was grateful to the police for expressing a genuine concern for his well-being. This bolstered Bowles' credibility because it established that his testimony at trial was based on his desire to tell the truth and not simply on his plea bargain with the prosecution. Therefore, the evidence was admissible, as matters relating to a witness's credibility are always relevant. *People v McGhee*, 268 Mich App 600, 637; 709 NW2d 595 (2005).

-4-

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant claims that he was denied the effective assistance of counsel. Again, we disagree.

This state has long recognized the importance of a criminal defendant's right to representation at trial. *People v Pickens*, 446 Mich 298, 311; 521 NW2d 797 (1994). The right to effective assistance is grounded in the United States and Michigan Constitutions.[1] US Const, Am VI; Const 1963, art 1, § 20. However, courts generally presume that counsel has afforded effective assistance, and it is the defendant who must overcome this burden. *People v Davis*, 250 Mich App 357, 368-369; 649 NW2d 94 (2002). To establish an ineffective assistance of counsel claim, the defendant "must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms[,] . . .( 2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different," and (3) the result was fundamentally unfair or unreliable. *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295, 307 (2012) (citation omitted).

Counsel generally has a duty to advocate the defendant's cause, consult with the defendant on important decisions, keep the defendant informed of significant developments in the case, and "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland v Washington*, 466 US 668, 688; 104 S Ct 2052; 80 L Ed 2d 674 (1984). However, "this Court will not substitute its judgment for that of counsel regarding matters of trial strategy," *Davis*, 250 Mich App at 368, nor will it asses counsel's competence with the benefit of hindsight. *People v Matuszak*, 263 Mich App 42, 58; 687 NW2d 342 (2004). Moreover, "[a] particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *Id.* at 61. Trial strategy can involve the presentation of evidence, examination of witnesses, and closing arguments. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008).

Here, defendant's ineffective assistance claim fails for two reasons. First, as fully discussed above, none of the leading questions asked by the prosecution elicited inadmissible evidence resulting in prejudice. Second, defense counsel's decision not to object to the prosecution's leading questions was a matter of sound trial strategy. Because the prosecution was not eliciting inadmissible evidence when asking leading questions, any objection by defense counsel would have merely resulted in a rephrasing of the prosecution's question. It would not have changed any of the witness's testimony. In addition, by continuously making technical objections, the jury could have viewed defense counsel as an obstructionist. Finally, understanding that the prosecution was not eliciting inadmissible evidence, defense counsel could have reasonably believed that it would be better to challenge the witnesses' testimony through cross-examination rather than by objection.

---

[1] The "intention underlying the Michigan Constitution does not afford greater protection than federal precedent with regard to a defendant's right to counsel when it involves a claim of ineffective assistance of counsel." *Pickens*, 446 Mich at 302.

# IV. SENTENCING

Finally, defendant claims the lower court improperly scored 10 points under Prior Record Variable (PRV) 5 of the sentencing guidelines. We agree and therefore remand for resentencing consistent with this opinion.

According to the Presentence Investigation Report (PSIR), defendant was convicted of three different misdemeanor offenses prior to sentencing in this case. He was convicted of operating while impaired on July 2, 2003. He was also convicted of interfering with electronic communications and domestic violence on August 24, 2009. The lower court considered all three of these convictions when scoring PRV 5 at 10 points.

Under MCL 777.55(1)(c), the lower court must score ten points toward a defendant's total prior record score if he has three or four prior misdemeanor convictions. The statute defines a prior misdemeanor conviction as "a conviction for a misdemeanor… entered before the sentencing offense was committed." MCL 777.55(3)(a). As noted above, defendant received two of his prior misdemeanor convictions on August 24, 2009. According to bank records obtained from Merchantile, the embezzlement scheme yielded $140,971.99 in cashed checks from March 2008 through July 2009. Thus, defendant's two misdemeanor convictions appear to have occurred after he had embezzled more than $100,000, but before he ceased embezzling property in January 2010. We must therefore determine whether defendant's two August 24, 2009 misdemeanor convictions occurred before he "committed" the sentencing offense of embezzling more than $100,000.

A court's primary purpose in interpreting a statute is to effectuate legislative intent. *Michigan Ed Ass'n v Secretary of State*, 489 Mich 194, 217-18; 801 NW2d 35 (2011). If statutory language is clear and unambiguous, courts presume the intended meaning is as expressed and further construction is neither required nor permitted. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012). "All other rules of statutory construction are ancillary to this primary duty, and serve only as guides to assist the courts in determining legislative intent with a greater degree of certainty." *People v Goulett*, 103 Mich App 381, 384; 303 NW2d 21 (1981). Thus, "courts may not speculate regarding legislative intent beyond the words expressed in a statute." *Michigan Ed Ass'n*, 489 Mich at 217.

Determining legislative intent must begin by examining the language of the statute itself. *United States Fid Ins & Guar Co v Michigan Catastrophic Claims Ass'n*, 484 Mich 1, 13; 795 NW2d 101 (2009). The plain meaning of a statute's words provide the most reliable evidence of the Legislature's intent. *Id.* Courts must accord an undefined statutory term its ordinary meaning and may not substitute alternative language for that of the Legislature. *Lash v Traverse City*, 479 Mich 180, 189; 735 NW2d 628 (2007).

Under MCL 750.174(1), a defendant is guilty of embezzlement when he or she (1) receives property belonging to another person or legal entity while in the role of trustee or custodian of that property, and (2) converts that person or entity's property to his or her own use. A defendant convicted of embezzlement will face different penalties depending on how much he or she has embezzled. See MCL 750.174(2)-(7). For instance, a defendant who embezzles more than $100,000 can face a maximum term of imprisonment of 20 years, while a defendant who

embezzles between $1,000 and $10,000 will face a maximum of just 5 years imprisonment. MCL 750.174(4); MCL 750.174(7). When a defendant's course of conduct is directed against only one victim, the value of money or personal property he or she has embezzled in separate incidents may be aggregated to determine the total value of money or property embezzled from that victim. MCL 750.174(8).

Based on the clear language of the statute, defendant "committed" the offense of embezzlement the moment he took property from GM, as custodian of that property, and converted it to his own personal use. Because GM was the only victim of defendant's scheme, the amount of money defendant embezzled throughout the course of his conduct can be aggregated to determine the total value of property he embezzled. As noted above, the evidence strongly suggests that defendant's embezzlement scheme yielded at least $140,971.99 by the end of July 2009. Because MCL 750.174 does not differentiate between amounts embezzled greater than $100,000, this amount satisfies the amount required to obtain the maximum possible penalty under the statute. Thus, if defendant satisfied all of the elements required to commit the offense of embezzlement greater than $100,000 under MCL 750.174(7) by the end of July 2009, his two misdemeanor convictions from August 2009 did not occur before he committed the sentencing offense.

The prosecution argues that defendant's August 2009 misdemeanor convictions should nonetheless be included in the scoring of PRV 5 because embezzlement is a continuing offense. We disagree. Even if embezzlement is a continuing offense, defendant cites no authority for the proposition that a continuing offense has not been "committed" until the very end of the time period in which the defendant carried out the offense. Generally, a continuing offense is one which extends over some period of time, and "the prosecution may charge and prove the offense in any part of such period." *People v Norwood*, 312 Mich 266, 275; 20 NW2d 185 (1945). Therefore, a continuing offense is considered "committed" for the entire time period that it continues. Defendant continued to embezzle property from GM through January 2010, and the prosecution was permitted to wait until that point to bring charges against him. However, that does not mean that he did not fully commit the crime of embezzlement by July 2009.

The prosecution would not concede that defendant had embezzled more than $100,000 by the end of July 2009. Thus, the lower court will have to make a factual finding on this issue before it scores PRV 5. If it determines that embezzlement of more than $100,000 occurred by this date, the lower court should not include defendant's most recent two misdemeanor convictions when scoring PRV 5. Since that would result in that variable being scored at 2 points, reflecting only one prior misdemeanor conviction, bringing defendant's total prior record variable score down from 15 to seven, which in turn would reduce defendant's sentencing guidelines range to 15 to 31 months, defendant would be entitled to resentencing.

Affirmed but remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Kurtis T. Wilder
/s/ Deborah A. Servitto
/s/ Cynthia Diane Stephens