NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Respondent*,

*v.*

GARY AUSTIN WORRELL, *Petitioner*.

No. 1 CA-CR 23-0356 PRPC
FILED 2-15-2024

Appeal from the Superior Court in Yavapai County
No.  P1300CR201701536
The Honorable Debra R. Phelan, Judge

**REVIEW GRANTED AND RELIEF DENIED**

COUNSEL

Yavapai County Attorney's Office, Prescott
By Scott W. Blake
*Counsel for Respondent*

Law Office of Randal B. McDonald, Phoenix
By Randal Boyd McDonald
*Counsel for Petitioner*

---

**MEMORANDUM DECISION**

Vice Chief Judge Randall M. Howe delivered the decision of the court, in which Presiding Judge Anni Hill Foster and Judge Brian Y. Furuya joined.

---

**H O W E**, Judge:

¶1 Gary Austin Worrell seeks review of the trial court's order, which denied his first petition for post-conviction relief ("PCR") filed under Arizona Rule of Criminal Procedure ("Rule") 32.1. We have considered the petition for review and, for the reasons stated, grant review but deny relief.

**FACTS AND PROCEDURAL HISTORY**

¶2 One morning in 2017, Worrell and his wife, H.W., brought their son, C.W., then almost five months old, to a hospital emergency room because his upper right arm was swollen, causing him pain. Hospital personnel took four x-rays, revealing a recent fracture of C.W.'s right humerus and other healed fractures—approximately six to eight weeks old—in several of his ribs and left forearm. The emergency room doctor who examined C.W. suspected that all the fractures resulted from child abuse because (1) the injuries occurred at different times, (2) C.W. was "nonambulatory," and (3) no alternative explanation for the fractures was evident. The Department of Child Safety ("DCS") and law enforcement launched an investigation.

¶3 A detective questioned Worrell and H.W. separately at the hospital. Worrell repeatedly denied having any knowledge of how C.W. was injured. Eventually, however, he admitted during the questioning that when C.W. kept removing his pacifier the previous night and "just wouldn't stop" crying, Worrell pushed his arm down and heard a "pop." Worrell also recalled that C.W.'s ribs and left forearm were "tender" approximately two months earlier, and he acknowledged he might have caused those injuries when he "pulled" C.W. down from his changing table to the ground.

¶4 The State charged Worrell with two counts of intentionally or knowingly committing child abuse. DCS removed C.W. from Worrell and H.W.'s custody and placed him with a foster family. C.W. suffered no more

2

fractures and exhibited no atypical medical conditions while in the foster family's custody.

¶5           Before trial, Worrell hired an expert who opined that C.W. was not abused and that his injuries were caused by metabolic bone diseases and vitamin D deficiency. But Worrell and his counsel lost contact with this expert witness about a month before trial. Worrell's counsel advised Worrell to proceed to trial without a medical expert. His trial strategy changed to challenging Worrell's purported confession instead. To do so, Worrell and his counsel hired an expert on false and coerced confessions.

¶6           At Worrell's trial, the State presented three expert medical witnesses—the emergency room doctor, a nurse practitioner who had evaluated C.W. in person shortly after the emergency room visit, and a pediatric child abuse specialist who had reviewed C.W.'s records and relevant police reports. All three expert witnesses agreed that C.W.'s injuries were consistent with child abuse or nonaccidental trauma because no alternative medical reason explained the injuries.

¶7           Worrell did not offer any medical evidence in his defense, but he suggested that C.W.'s injuries could have resulted from an undiagnosed vitamin deficiency. Worrell's counsel asked the emergency room doctor if he had tested C.W. for any vitamin deficiencies, to which the emergency room doctor answered in the negative. The nurse practitioner testified she had followed protocol and had done "labs to make sure that there [was] no medical problem with the baby regarding [his] bones." She testified that C.W. underwent a "skeletal survey" consisting of 21 x-rays and laboratory tests to make sure he "didn't have a medical condition," including vitamin D deficiency, rickets, or brittle bone that may have contributed to his injuries. And "all of those bone labs were completely normal." Finally, she testified that she did not test C.W. for the genetic bone disorder Osteogenesis Imperfecta ("OI") because he did not present the symptoms associated with OI. She also testified that C.W. did not have OI if he did not have any more broken bones since being taken from his parents' custody.

¶8           The pediatric child abuse specialist testified that C.W. had undergone two standard metabolic screenings at birth and both were normal, with no indication of any underlying metabolic bone disease. She also testified that "children with metabolic bone disease heal very poorly" and that the "healing takes a long time," but C.W.'s x-rays showed that his right arm was healing normally. Based on her review of C.W.'s medical records, she concluded that C.W. "was a healthy boy with no underlying

illnesses," such as "rickets[,] any type of metabolic bone disease or genetic bone disease," or vitamin D deficiency.

¶9　　　　Along with suggesting an alternative medical reason for C.W.'s injuries, Worrell also argued that his confessions were falsely made. Worrell's counsel vigorously cross-examined the detective that questioned Worrell, focusing on the detective's questioning techniques and having the detective go through the 23 times that Worrell had denied any wrongdoing. During the long direct examination, Worrell's false confessions expert testified that the detective's interrogation of Worrell incorporated many tactics associated with eliciting false confessions, pointing out each specific tactic used.

¶10　　　　The jury found Worrell guilty of (1) child abuse committed intentionally or knowingly for C.W.'s broken humerus in his upper right arm, and (2) the lesser-included offense of child abuse committed recklessly for the injuries to C.W.'s ribs and left forearm. After the State presented evidence in an aggravation phase, jurors found that (1) C.W. suffered physical harm, and (2) Worrell was on probation at the time of the offenses. Considering the convictions for which Worrell was serving probation, the trial court sentenced him as a repetitive offender to concurrent, somewhat aggravated, prison terms of 12 and six years respectively for the two child abuse convictions. Worrell timely appealed and this court affirmed his convictions and sentences. *State v. Worrell*, 1 CA-CR 19-0546, 2020 WL 7828772 (App. Dec. 31, 2020) (mem. decision).

¶11　　　　Worrell then petitioned for PCR. In his petition, he claimed that he received ineffective assistance of counsel ("IAC") because his trial counsel induced the State to present medical testimony and then his counsel presented none. He also claimed that newly discovered evidence existed. Over three years after the trial, H.W. collected C.W.'s DNA and sent it to a genetic testing company. The DNA testing results showed that he had a mutation on his COL1A1 gene, which is associated with bone diseases such as Ehlers-Danlos Syndrome ("EDS") and OI. Then, upon examining C.W., another nurse practitioner concluded that C.W. exhibited symptoms typically associated with EDS and OI. Based on the newly discovered evidence, Worrell also claimed actual innocence. Finally, he claimed that the State had violated *Brady v. Maryland*, 373 U.S. 83 (1963), because the newly discovered evidence was in the State's possession, given that C.W. was in the State's custody.

¶12　　　　The trial court found that Worrell failed to show his trial counsel performed below an objective standard of reasonableness. It also

found that the claimed newly discovered evidence was addressed at trial and thus was not newly discovered evidence. The court did not separately address Worrell's *Brady* violation and actual innocence claims. But while analyzing the newly discovered evidence claim, it noted that Worrell failed to request further testing of C.W. It stated that Worrell did not move the juvenile court to order further medical examination of C.W. nor did he seek relief under Rule 15.1(g), which allows a defendant to move the court to order the State to disclose material information. It concluded that Worrell had failed to raise any colorable claim under Rule 32 and therefore summarily dismissed his PCR petition. This petition for review followed. This court has jurisdiction under A.R.S. § 13–4239(C) and Rule 32.16(a)(1).

## DISCUSSION

**¶13**　　This court reviews a trial court's ruling on a PCR petition for an abuse of discretion. *State v. Bigger*, 251 Ariz. 402, 407 ¶ 6 (2021). This court will affirm a trial court's ruling if "it is legally correct for any reason." *State v. Roseberry*, 237 Ariz. 507, 508 ¶ 7 (2015) (citation omitted).

## I.　　Newly Discovered Evidence

**¶14**　　Worrell argues that the trial court erred in finding that he did not present a colorable claim of newly discovered evidence and denying his request for an evidentiary hearing. A convicted defendant can obtain a new trial if "newly discovered material facts probably exist, and those facts probably would have changed the judgment or sentence." Rule 32.1(e). A fact is "newly discovered" only if (1) it was discovered after trial or sentencing, (2) the petitioner exercised due diligence to discover it before trial, and (3) it is material and not merely cumulative or solely for impeachment. *Id.* at (e)(1)–(3); *see also State v. Amaral*, 239 Ariz. 217, 219 ¶ 9 (2016). Our supreme court has held that "evidence arising from events occurring after the trial are not newly discovered material facts." *Amaral*, 239 Ariz. at 220 ¶ 13.

**¶15**　　Worrell did not present a colorable claim of newly discovered evidence because the evidence was not "newly discovered"; whether C.W. had metabolic bone disease was raised and debated at trial.  All three of the State's medical experts were cross-examined on the issue. Their testimonies showed that C.W. had undergone tests for metabolic bone disease and the results were normal. The pediatric child abuse specialist ruled out vitamin D deficiency and any other underlying bone diseases or deficiencies as the cause for C.W.'s injuries. The nurse practitioner testified that if C.W. had not broken any more bones after being removed from his parents' custody,

he did not have OI. And testimony during the trial showed that C.W. suffered no other fractures after DCS removed C.W. from his parents' custody. The jury and trial judge therefore contemplated the likelihood that C.W.'s injuries could have been caused by Worrell's allegation of metabolic bone disease. Thus, the trial court did not abuse its discretion in denying Worrell's request for an evidentiary hearing.

## II.    Ineffective Assistance of Counsel

¶16        Worrell argues that the trial court erred in finding that he did not present a colorable claim of ineffective assistance of counsel. "If a defendant presents a colorable claim, he is entitled to a hearing to determine whether counsel rendered effective assistance." *Bigger*, 251 Ariz. at 407 ¶ 9 (citation omitted). To determine whether a defendant is entitled to an evidentiary hearing, we ask "whether he has alleged facts which, if true, would *probably* have changed the verdict or sentence." *Id.* (citation omitted).

¶17        To prove an IAC claim, a defendant must show that "counsel's conduct fell below an objective standard of reasonableness and that he was prejudiced thereby." *Id.* at 407 ¶ 8 (citing *Amaral*, 239 Ariz. at 220 ¶ 11). "This inquiry focuses on the practice and expectations of the legal community, and asks, in light of all the circumstances, whether counsel's performance was reasonable under prevailing professional norms." *Id.* (internal quotation marks and citations omitted). Counsel's performance "falls below the prevailing professional norms of the legal community" if it was unreasonable under the circumstances. *Id.* at 407 ¶ 10 (internal quotation marks and citation omitted).

¶18        When the alleged deficiency lies in counsel's defense strategy, we focus on "the rationale for the decision." *Id.* at 407–08 ¶¶ 10–11 (citation omitted). We presume that counsel "acted properly unless a defendant can show that counsel's decision was not a tactical one but, rather, revealed ineptitude, inexperience or lack of preparation." *Id.* at 407 ¶ 10 (internal quotation marks and citation omitted).

¶19        The record supports the trial court's ruling that trial counsel's representation did not fall below objectively reasonable standards. As the court noted, Worrell's counsel's decision to challenge Worrell's purported confession rather than request further medical examination of C.W. and offering those results at trial was a tactical one. Counsel could have refrained from requesting further medical examination of C.W. because the results, rather than help Worrell's defense, could have harmed it if the results showed no metabolic bone disease. Further, the fact that the jury

6

convicted Worrell of the lesser-included offense of child abuse committed recklessly shows his trial counsel's effectiveness. The record also shows that Worrell's counsel participated in pretrial litigation, vigorously cross-examined the State's witnesses, and raised objections. Worrell has shown no error.

¶20 Worrell argues that his trial counsel's performance fell below objectively reasonable standards because he failed to cross-examine the nurse practitioner with her inconsistent testimony or impeach her with a prior disciplinary action and failed to object to hearsay testimony. But "the extent of cross-examination must be left to the judgment of counsel" and counsel's "decision as to the extent of the impeachment of a witness is a matter of trial strategy." *Payne v. State*, 509 S.W.3d 830, 836 (Mo. Ct. App. 2016) (internal quotation marks and citation omitted). As to counsel's failure to object to the alleged hearsay testimony, counsel "could have refrained from objecting because he did not wish to draw undue attention to the testimony or because he felt the jury might think the defendant was trying to conceal more than was actually revealed by the answers." *State v. Noleen*, 142 Ariz. 101, 106 (1984). Thus, because counsel's challenged conduct could have had some reasoned basis, Worrell's IAC claim fails.

## III.    Other Issues

¶21 Worrell argues that this court should review de novo his *Brady* violation and actual innocence claims because the trial court failed to address them in its ruling. But he cites no authority in support of this argument. And we need not entertain his argument because the trial court did address all his claims.

¶22 To prove a *Brady* violation, a defendant must show that (1) "the evidence at issue [was] favorable to [him], either because it is exculpatory, or because it is impeaching"; (2) "evidence [was] suppressed by the State, either willfully or inadvertently"; and (3) "prejudice [] ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The court addressed Worrell's *Brady* violation claim in analyzing the due diligence prong of the newly discovered evidence claim. It noted that, although C.W. was in DCS's custody, Worrell was legally C.W.'s father until his parental rights were terminated, and he could have moved the juvenile court to order further medical examination on C.W. It also noted that Worrell failed to seek relief under Rule 15.1(g), which allows a defendant to move the court to order the State to disclose material information. The record does not show that the State suppressed favorable evidence. And even if the State suppressed favorable evidence to Worrell, that suppression would not amount to a

*Brady* violation because, as explained *infra* ¶ 23, the evidence would not have "produced a different verdict." *Strickler*, 527 U.S. at 281. We discern no error.

**¶23** The trial court also did not err on Worrell's actual innocence claim. A defendant is entitled to relief under Rule 32.1(h) if he can show "by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would find the defendant guilty of the offense beyond a reasonable doubt." Worrell's actual innocence claim was based on his newly discovered evidence claim. So, the trial court addressed Worrell's actual innocence claim when it discussed his newly discovered evidence claim and found that Worrell failed "to raise any colorable claim pursuant to Ariz. R. Crim. P. 32." Because his newly discovered evidence claim failed, Worrell did not present new evidence of innocence. Therefore, his actual innocence claim failed, and the trial court did not need to address it again separately. And as addressed in this court's decision on appeal, "substantial evidence" supported the jury's verdicts. *Worrell*, 1 CA-CR 19-0546, 2020 WL 7828772, at *5 ¶ 29.

**CONCLUSION**

**¶24** We grant review but deny relief.



AMY M. WOOD • Clerk of the Court
FILED: AA

8